Nathaniel BARLEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 71486.

Court of Criminal Appeals of Texas, En Banc.

June 21, 1995.

Rehearing Denied Sept. 13, 1995.

George McCall Secrest, Jr. (on appeal) Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and Scott A. Durfee, Lynne Parsons & Keno Henderson, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for State.

## OPINION

MEYERS, Judge.

Appellant, Nathaniel Barley, was convicted of capital murder. TEX.PENAL CODE ANN. § 19.03(a)(2). During the punishment phase the jury affirmatively answered the special issues set forth in Texas Code of Criminal Procedure art. 37.071(b). The trial judge sentenced appellant to death as required by Texas Code of Criminal Procedure art. 37.071(e). Direct appeal is automatic. TEX. CODE CRIM.PROC.ANN. art. 37.071(h). We will affirm.

Appellant raises four points of error. Points of error one and four concern identification procedures alleging violations of appellant's rights to due process and counsel. Appellant's second point of error alleges error in the admission of a prior statement of a witness. And appellant's third point of error argues that the evidence is insufficient as a matter of law to support the jury's affirmative finding of future dangerousness. The sufficiency of the evidence to support guilt is not challenged.

On the morning of May 4, 1991, a Sav–Mart store in Houston was robbed and the owner mortally wounded. On a subsequent tip, the police arrested appellant for the offense. While the gun used and the money stolen in the offense were never recovered, appellant was none-the-less later convicted of capital murder and sentenced to death.

■ In point of error number three, appellant alleges that the evidence supporting the jury's affirmative answer to the second special issue on future dangerousness is insufficient as a matter of law. In reviewing the sufficiency of the evidence at the punishment, it is well-settled that we view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could make the finding beyond a reasonable doubt. *Barnes v. State,* 876 S.W.2d 316, 322 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994).[1]

In the instant case, the evidence presented showed that appellant entered the victim's store with a "small black short-barreled gun" in his hand. He pointed the gun at the victim's head and said in a loud voice, "Give me the money or I'll shoot your head off." When the victim responded in the negative and started to turn, appellant started to

shoot. After appellant grabbed a paper sack which contained approximately nine thousand dollars, he ran around the side of the building and jumped into a waiting car.

Each of these actions exhibited foresight and planning on appellant's part. He not only armed himself, but he told the victim that he had every intention of killing him if he did not cooperate. The subjective existence of this intention is further supported by the fact that appellant shot not once, but four times apparently without a second word of warning. Appellant also had a friend waiting with a car outside.

The medical examiner determined that the victim had been shot a total of four times including a shot to the chest which killed him. A firearms examiner testified that the fatal shot came from a .38 special or .357 Magnum and was fired from a distance of six inches or less.

Also, the State presented to the jury evidence of at least nine prior offenses including:

* burglary of a motor vehicle (Aug. 1982—probated sentence subsequently revoked)

* possession of marijuana (Sept. 1985)

* unauthorized use of a motor vehicle (Dec. 1985)

* delivery of marijuana (May 20, 1986)

* delivery of marijuana (May 22, 1986)

* unlawfully carrying a weapon (knife) (June 1987)

* trespass of a building (Nov. 1988)

* unauthorized use of a motor vehicle (Aug. 1988)

* possession of a controlled substance (cocaine) (April 1989).

---

1. The jury is permitted to look at several factors in its review of future dangerousness including, but not limited to:

  1. the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties;

  2. the calculated nature of the defendant's acts;

  3. the forethought and deliberateness exhibited by the crime's execution;

  4. the existence of a prior criminal record, and the severity of the prior crimes;

  5. the defendant's age and personal circumstances at the time of the offense;

  6. whether the defendant was acting under duress or the domination of another at the time of the offense;

  7. psychiatric evidence; and

  8. character evidence.

*Barnes, supra.; Keeton v. State,* 724 S.W.2d 58, 61 (Tex.Crim.App.1987) ("Keeton I"). These factors are also helpful in this Court's evaluation of the sufficiency of the evidence of future dangerousness.

While these offenses are not overtly violent, they do show an escalating and on-going pattern of disrespect and continued violations of the law. Plus, a reasonable juror could have interpreted some of the offenses like the delivery charges as evidencing an intent to indirectly harm another.

An officer of the Corpus Christi Police Department testified from his own experience as well as from conversations he had with other officers that appellant was not a peaceful and law-abiding citizen. Three Harris County jailers testified as to two different inmate fights in which appellant was involved.

Additionally, appellant's mother testified that appellant had admitted to having a cocaine problem between 1989 and 1991 and that she had seen him smoking marijuana during that time.

Given the standard on appeal of looking at the evidence in the light most favorable to the verdict, we hold that a reasonable juror could have found that a probability existed that appellant would be a continuing danger. Point of error number three is overruled.

In point of error number one appellant complains that the in-court identification of appellant by three witnesses should have been suppressed in that their ability to make an accurate identification was tainted and violated his due process rights. Appellant argues that this taint was the result of impermissibly suggestive out-of-court identification procedures which created a substantial likelihood of mistaken identification.

The rather confusing evidence pertaining to this point of error was developed at a hearing on identification and at trial.[2] On the morning of Saturday, May 4, 1991, the perpetrator entered a Sav–Mart grocery store behind the victim and a customer, one Timothy Demby. Another customer, Millicent Golden, was already in the store and standing at the courtesy booth approximately 30 feet from the door. Stacy Pierson, Golden's twelve-year-old son, was sitting outside in a truck facing the front door of the store. Upon hearing the robber's command to give him money, Demby and Golden each looked at the robber and then ran to the back of the store. Pierson saw the perpetrator as he ran out of the store, stopping briefly in front of the truck in which Pierson was sitting and then running to a waiting vehicle. All three witnesses were able to describe the assailant at the scene.[3] Testimony showed that the lights in the store were on and it was a bright, clear morning.

Two days later, Golden and Pierson went to the police station to make statements. According to police testimony, each was shown a photo array (hereinafter "array # 1") which included a photograph of appellant. Demby was shown this array at a later time. The officer conducting the procedure stated that he showed each witness the array separately and made no suggestion that a suspect was included or otherwise directed the witnesses to a particular choice. Apparently, none of the witnesses were able to make an identification.[4]

---

2. These facts are established by testimony from both the pre-trial hearing and the trial. *Hardesty v. State*, 667 S.W.2d 130, 133, n. 6 (Tex.Crim. App.1984) (Generally this Court would look only to the evidence adduced at the hearing because the trial judge did not have the benefit of the testimony from trial when making his ruling. However, when the alleged error is the admission of evidence at trial and the issue was consensually litigated there, the evidence will be considered to have been re-opened.). *Webb v. State*, 760 S.W.2d 263, 272, n. 13 (Tex.Crim.App. 1988), *cert. denied*, 491 U.S. 910, 109 S.Ct. 3202, 105 L.Ed.2d 709 (1989) (In an identification case, limiting review to the evidence adduced at the hearing could lead to an untenable result; therefore, we place no limit on the review of identification admissibility.).

3. While their descriptions were otherwise primarily the same, Golden and Pierson both said that the perpetrator was wearing an orange shirt, while Demby described him as wearing a blue striped shirt.

4. This assertion comes from the testimony of Detective Ott. However, the witnesses have different recollections about when and from which photo array they identified appellant. Specifically, Pierson testified at both the hearing and at trial that he did make an identification off of this first array, but not off of the second. Whereas, Golden never could identify appellant in array # 1, but did in # 2. And Demby testified at the hearing that he didn't identify appellant on either array, whereas at trial, he testified that he identified him on both.

Subsequently, the investigating officer went to question appellant in his home and found that appellant appeared "noticeably different" from the photograph which had been included in the first photo array. The officer asked appellant if he could take another photograph to show to the witnesses. Appellant consented. Because of the apparent darkness of the house, appellant's photograph was taken outside in the yard in the morning sunshine.

Using the new photograph, the officer compiled a second photo array (hereinafter "array # 2"). Because all of the other photographs were taken indoors against a solid color background, Detective Ott framed each picture in white paper in an attempt to make all of the photographs appear as similar as possible. On May 20 and 21, 1991, using the same procedure as before, the officer showed the array to each of the three witnesses. Each of the witnesses made what Ott described as a "strong tentative" identification of appellant.[5]

On May 31, 1991, appellant was arrested pursuant to a probable cause warrant pending identification. Appellant was included in a line-up which was viewed in person by Golden and Pierson and later on video by Demby.[6] As before, the officer made no suggestion that a suspect was in custody or in any way directed the witnesses to choose a particular person, if any at all. Each witness identified appellant as the perpetrator. After this identification, charges were filed against appellant in this cause.

Appellant moved to suppress the identification arguing that the pre-trial identification procedures had been impermissibly suggestive and, therefore, the identification by the witnesses in court would be tainted. The trial court held a hearing on this motion which commenced on Friday, May 22, 1992. Golden and Pierson were called to testify at the hearing, but arrived after it had commenced and the rule had been invoked. Upon becoming aware of their presence in the courtroom, the prosecuting attorney had them escorted out. Pierson testified later in the hearing and at trial that, prior to being escorted out, he recognized appellant as the person he had seen at the grocery store when appellant turned and stretched. Golden stated that she only saw the back of appellant's head and did not recognize him as the shooter from this angle. Both witnesses testified that another trial was in progress when they entered the courtroom. However, Pierson later acknowledged that one of the officers might have been on the stand at the time of their arrival. Both testified that they did not remember what had been said.

The hearing was continued on June 1, 1992. All three witnesses positively identified appellant as the perpetrator and asserted that their identification was based on what they observed at the scene of the offense. The trial judge denied the motion to suppress, finding that the photo spreads were not impermissibly suggestive: all of the witnesses had an opportunity to view appellant in good light on the day of the offense, and all testified that their identification of appellant during the hearing had been based on what they witnessed at the scene. The judge also found that while the rule had been violated, what the witnesses observed while they were in the courtroom did not contribute to an impermissibly suggestive identification of appellant. All three witnesses positively identified appellant at trial before the jury.

In considering the scope of due process rights afforded a defendant with regard to the admission of identification evidence, the United States Supreme Court has held that a pre-trial identification procedure may be so suggestive and conducive to mistaken identi-

---

5. Again, the testimony of Detective Ott. Pierson maintained that he did not identify appellant from this array and Demby couldn't seem to decide. Further, the witnesses subsequently agreed that the background of appellant's picture was quite different from the others but testified that they had not noticed the difference when viewing the array the first time.

6. All three witnesses testified that the participants in the line-up were black males. Golden and Pierson each said that they did not notice any difference in height, weight, or age such that any one individual stood out from the rest. Demby did note a difference in heights among the participants, but also stated that he was concentrating on facial features, specifically the participants' eyes.

fication that subsequent use of that identification at trial would deny the accused due process of law. *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Webb v. State*, 760 S.W.2d at 269. Hence, the Court formulated a two step analysis to determine the admissibility of an in-court identification: 1) whether the out-of-court identification procedure was impermissibly suggestive;[7] and 2) whether that suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Cantu v. State*, 738 S.W.2d 249 (Tex.Crim.App.), *cert. denied*, 484 U.S. 872, 108 S.Ct. 203, 98 L.Ed.2d 154 (1987). An analysis under these steps requires an examination of the "totality of the circumstances" surrounding the particular case and a determination of the reliability of the identification. *Id.*

■ Turning to the first prong of the analysis, we hold that the procedures utilized might have been suggestive, but not *impermissibly* so. Suggestiveness may be created by the manner in which the pre-trial identification procedure is conducted, for example by police pointing out the suspect or suggesting that a suspect is included in the line-up or photo array. *Herrera v. State*, 682 S.W.2d 313 (Tex.Crim.App.1984), *cert. denied*, 471 U.S. 1131, 105 S.Ct. 2665, 86 L.Ed.2d 282 (1985); *Rogers v. State*, 774 S.W.2d 247 (Tex. Crim.App.), *cert. denied*, 493 U.S. 984, 110 S.Ct. 519, 107 L.Ed.2d 520 (1989). Or it may also be created by the content of the line-up or photo array itself if the suspect is the only individual closely resembling the pre-procedure description. *See Williams v. State*, 675 S.W.2d 754 (Tex.Crim.App.1984). Furthermore, an individual procedure may be suggestive or the cumulative effect of the procedures may be suggestive.

■ In the instant case, appellant complains of four different procedures or opportunities which he claims contributed to the allegedly tainted in-court identification: two photographic arrays, a line-up, and the brief presence of two of the witnesses in the courtroom at the beginning of the pretrial hearing in violation of "the Rule." The first complained of photographic array consists of photos of six black males of similar features and similar heights. As the evidence set out above, Golden never could pick appellant out of this array, Pierson claims that he did although police testimony contradicts this, and Demby said at one point that he didn't and at another that he did. The testimony was consistent that the officer at no time indicated that a suspect was included in this array nor that he at any time suggested which individual to choose. We hold that this array was not suggestive.

■ The second photographic array also consisted of six black males of similar features. However, two of the photos appear to be older and faded and one is obviously taken in a different setting. This particular photograph has a small degree of greenery in the background as if it were taken outside in a yard and it has a very definitive sunlight reflection off of the individual's face giving the picture a more pinkish tint than the others. Again, the testimony clearly showed that at no time did the police officers indicate to the witnesses that a suspect was included in the photo array or line-up, nor did they suggest which individual the witnesses should choose, if any. While we do not encourage the utilization of photographs that are so different in lighting and background as were the pictures forming array # 2, we recognize that a second photograph may have been necessary due to the changes in appellant's appearance from the 1989 photograph included in array # 1 to his appearance in 1991. However, all of the witnesses testified they had not noticed the difference when viewing the array the first time, or if they had, it did not influence their identification. Hence, appellant has not shown by

---

7. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) used the term "impermissibly" (with regard to photographic arrays). However, *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) used the term "unnecessarily" (referring to line-ups).

This Court has used both terms without distinguishing between them. *Cf. Webb v. State*, 760 S.W.2d at 269 ("unnecessarily" and "impermissibly") and *Cantu v. State*, 738 S.W.2d 249 (Tex. Crim.App.), *cert. denied*, 484 U.S. 872, 108 S.Ct. 203, 98 L.Ed.2d 154 (1987) ("impermissibly").

clear and convincing evidence that, if suggestive, this second array was *impermissibly* so.

■ As to the corporeal line-up, the evidence reveals that there was a discrepancy in heights of the five participants of several inches. However, the witnesses also gave slightly different estimations of height of the perpetrator at the scene and at least one officer testified that it is not uncommon to have such discrepancies between eyewitness estimations and actuality. Notwithstanding this, all of the witnesses testified that they were concentrating on the facial features of the participants and either didn't notice the height discrepancy (Golden and Pierson) or else it did not influence their identification (Demby). Past this, all participants had similar features and were of similar build. Given the appearance of the line-up and the subsequent testimony, we hold that this was not a suggestive procedure.

■ We also agree with the trial judge that the Rule violation alone was not so suggestive as to result in a tainted in-court identification. Both witnesses involved testified that they had only been in the courtroom for about three minutes before they were asked to leave. Both were also unsure of exactly what was going on and therefore stated that the occurrence had no impact on their in-court identification of appellant. While Pierson testified that he did recognize appellant when appellant turned and stretched, Pierson also stated that he recognized him from the commission of the offense. In fact, all of the witnesses testified that their in-court identifications were based solely on what they observed at the scene of the crime. Therefore, we hold that no individual procedure was impermissibly suggestive.

■ We further hold that the cumulative effect of these procedures was not *impermissibly* suggestive. While appellant was the only person to consistently appear in each of the procedures utilized, the witnesses' each testified that they did not identify him at some point: Demby originally denied identifying him on either array, Pierson did not identify him on the second array until trial, and Golden never recognized him as appearing in the first array even after she knew his picture was supposedly there. Furthermore, each continued to maintain that their in-court identification of appellant was based on what they had individually observed on the day of the offense.

If anything, the confusing testimony indicates that the procedures were not suggestive at the time the witnesses first participated in them, but after testifying and trying to recall specifics, the witnesses became confused as to the particular happenings and the dates they occurred between the day of the offense and the trial. As such, we hold that these procedures, whether array #2 separately or the series cumulatively, might have been suggestive, but not *impermissibly* so. Holding that no *impermissibly* suggestive procedure was utilized, the need to assay whether under the circumstances it created a substantial likelihood of misidentification is obviated. *Webb v. State*, 760 S.W.2d at 269.

■ However, assuming *arguendo*, that either the second array separately or the cumulative effect of all of the incidences does constitute impermissibly suggestive pre-trial identification procedures, we must determine whether a very substantial likelihood for irreparable misidentification has been created. Reliability is the "linchpin" in determining admissibility of such identification testimony. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Cantu, supra.* If indicia of reliability outweigh suggestiveness then an identification is admissible. *Harris v. State*, 827 S.W.2d 949 (Tex.Crim. App.), *cert. denied*, —— U.S. ——, 113 S.Ct. 381, 121 L.Ed.2d 292 (1992). Appellant must show by clear and convincing evidence that the identification has been irreparably tainted before this Court will reverse his conviction. *Id.*

■ In making a determination as to whether a very substantial likelihood for irreparable misidentification has been created, we consider several non-exclusive factors enumerated by the Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). *Webb, supra; Cantu, supra.* These factors are: 1) the witness' opportunity to view the criminal act, 2) the

witness' degree of attention, 3) the accuracy of the suspect's description, 4) the level of certainty at the time of confrontation, and 5) the time between the crime and confrontation. *Id.*[8] These factors are weighed against the corrupting effect of any suggestive identification procedures. *Id.*

■■■ With regard to the present case, the evidence shows that each witness had an opportunity to view appellant from within a few feet to a distance of approximately thirty feet. In each instance, the view was unobstructed and the witness was able to see a full frontal view. It was also shown that the lighting in which to observe the perpetrator was good: it was either within the well-lit store or in the bright morning sunlight. The fairly detailed descriptions given at the scene further support this conclusion. *See Delk v. State*, 855 S.W.2d 700, 706–707 (Tex.Crim. App.), *cert. denied*, —— U.S. ——, 114 S.Ct. 481, 126 L.Ed.2d 432 (1993). Additionally, the witnesses were more than just casual observers of the crime. Therefore, they had more reason to be attentive. Both Golden and Demby were in the midst of the occurrence and Pierson, besides apparently having the inexhaustible curiosity of a typical twelve-year-old boy, also had a vested interest in that his mother was inside the store and the robber ran directly toward the truck in which he was sitting. *See Cantu v. State*, 738 S.W.2d 249 (Tex.Crim.App.), *cert. denied*, 484 U.S. 872, 108 S.Ct. 203, 98 L.Ed.2d 154 (1987) (a witness who is also a victim has a greater degree of attention than a casual bystander).

Considering the accuracy of the witnesses' descriptions, we note that appellant fits within the detailed descriptions provided at the scene by each of them. All of their descriptions were fairly detailed including appellant's clothing and hairstyle. Likewise, the witnesses were able to identify cosmetic differences in appellant's appearance at the

hearing and trial from his appearance at the scene. While the witnesses were not completely consistent in their testimony as to in which array they identified appellant or what specific words they used to describe him, all of them were positive that appellant was the perpetrator based on their observations at the scene. Hence, we determine that their in-court identification was independent from the pre-trial identification procedures.

Finally, the amount of time between the crime and the time the witnesses were confronted, approximately twelve months, had no recognizable effect on the witnesses' recollection or identification as evidenced by their fairly detailed descriptions at the time of trial. To the contrary, the witnesses failed to identify appellant in array # 1 (which was not suggestive and was offered before any hint of suggestiveness had entered the identification procedures) only two days after the crime. In fact, Golden still couldn't pick appellant out of the first array at trial. Further, each was very specific as to the differences in how appellant appeared at the scene of the crime versus how he appeared at trial.

While the accuracy of the witnesses' in-court identification may be questioned, the reliability does not falter. We cannot discount the fact that all of the witnesses testified that their identification in-court was based solely on what they had observed at the scene. Weighing this reliability against the modest suggestive aspects of the pre-trial identification procedures leads us to conclude that no substantial risk of irreparable misidentification was created so as to deny appellant due process and that the testimony was properly allowed before the jury. Point of error number one is overruled. ▸

In a related point of error number four, appellant alleges that his right to counsel as guaranteed by the Sixth Amendment to the

---

**8.** Factors applied in reference to line-ups, as opposed to photographic arrays which the *Biggers* list basically refers to, are slightly different: 1) the witness' opportunity to observe the criminal act, 2) any discrepancy between the pre-lineup description and defendant's actual appearance, 3) whether the witness identified another individual prior to the allegedly illegal lineup, 4) prior identification of the accused by the witness, or 5) failure to identify the accused prior

to the suggestive line-up, and 6) amount of time between crime and the illegal lineup. *Herrera v. State*, 682 S.W.2d at 318; and *U.S. v. Wade*, 388 U.S. 218, 241–43, 87 S.Ct. 1926, 1940, 18 L.Ed.2d 1149 (1967). This Court has never limited the factors to be considered when examining the totality of the circumstances; therefore, we will use these and other factors which have been identified as useful guidelines, but will not limit our consideration of other information.

United States Constitution and Article I, § 10 of the Texas Constitution was violated by placing him in a line up for identification purposes without the benefit of counsel.

■ We first note that appellant did not separately brief his point of error with regard to the allegation made under the Texas Constitution. That being the case, this part of the point of error is overruled pursuant to *Heitman v. State,* 815 S.W.2d 681 (Tex.Crim. App.1991), holding that rights asserted under the Texas Constitution are not adequate if neither argument nor authority has been provided in support thereof.

■ As to appellant's Sixth Amendment claim, appellant concedes, and the record reflects, that no formal charges were pending against him at the time of the lineup. It is well-settled that there is no Sixth Amendment right to counsel prior to the initiation of adversary judicial criminal proceedings. *Kirby v. Illinois,* 406 U.S. 682, 688–90, 92 S.Ct. 1877, 1881–83, 32 L.Ed.2d 411 (1972); *Foster v. State,* 787 S.W.2d 385, 385–86 (Tex. Crim.App.1990) (no further protection is given under the Texas Constitution art. 1, § 10). Point of error four is overruled.

■ Appellant's second point of error alleges reversible error in the trial court's introduction of "the written statement of Jimmy Fuller, who was called as a witness by the prosecution and then impeached, ostensibly by his prior inconsistent statements, when in fact, said impeachment was employed as a mere subterfuge to get otherwise inadmissible hearsay evidence before the jury."

Texas Rule of Criminal Evidence 607 expressly allows for the credibility of a witness to be attacked by any party, "including the party calling him." The record reflects that first Sergeant Collier of the Houston Police Department was called to the stand and he was questioned, among other subjects, about establishing appellant as a suspect and the identification process involved. Fuller was then called to the stand to testify. It was established that Fuller was not on the stand of his own free will (he was subpoenaed) and he basically denied (or didn't exactly remem-

ber) what he had said in his written statement. Sergeant Collier was then recalled to the stand.

During this second time that Collier was on the stand, he was asked about his telephone conversation with Fuller at which time appellant objected "to anything that was said. It would be hearsay, judge." This objection was sustained. Two more hearsay questions were then immediately elicited, and objections sustained, in response to the State's questions. In fact, appellant said, "I'm going to object, Your Honor, as to what was said. If I need to get a running objection on this particular hearsay, I will ask the court for a running objection."

■ When the statement was actually offered into evidence, appellant objected to:

the introduction of State's Exhibit No. 16 on the basis that Mr. Fuller has testified that he did not voluntarily and knowingly sign this statement, didn't know what the contents were. There's no indication of any rights having been given to him, even though he was not a suspect. Our objection goes to the point that he didn't understand what he was signing and doesn't recall—having even made this statement. It was not recorded as required by 38.23 and my objection goes to that, judge.

This objection was overruled and the statement was entered into evidence.[9] The trial court then *sua sponte* gave the jury the following instruction:

The jury will decide what weight, if any, to give that statement. You will consider it just like any other statement or any evidence that you hear and you will deem it and give it whatever weight you think it merits at the appropriate time.

After an off-the-record discussion at the bench and another hearsay objection on which appellant failed to get a ruling, the trial court instructed the jury additionally:

Members of the jury, once again, this witness is testifying as to certain statements made out of court not for the truth of them but to show to the jury, if it does, in fact, show to the jury that the witness may, at a

9. The voluntariness of the statement is not attacked on appeal.

previous time, has made certain other different statements that he does not now admit or remember. They are admitted only for that limited purpose, to show you that certain statements may have or may not have been made out of court at a previous time and this is not offered for the truth of the statement asserted.[10]

Appellant did not ask for a ruling on his prior objection at this point, nor did he further pursue the matter. From this chain of events, we hold that appellant did not preserve any error and the objection made at trial does not comport with the complaint on appeal.[11] *Johnson v. State*, 803 S.W.2d 272, 292 (Tex.Crim.App.1990), *cert. denied*, 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1078, (1991); *Rezac v. State*, 782 S.W.2d 869, 870 (Tex.Crim.App.1990).

Finding no reversible error, the judgment and sentence of the trial court are affirmed.

CLINTON, J., dissents. Re: point 3, see *Roney v. State*, 632 S.W.2d 598, 603 (Tex.Cr. App.1982); re: point 4, see *Foster v. State*, 787 S.W.2d 385, 386 (Tex.Cr.App.1990) (CLINTON, J., dissenting).

BAIRD, Judge, concurring.

Although I agree with the majority's ultimate resolution of appellant's third point of error, I write separately to further address his contention that the evidence is insuffi-

cient to support the jury's affirmative answer to second punishment issue regarding future dangerousness.

## I.

Over the years, this Court has developed a general set of guidelines with which to review challenges to the sufficiency of the evidence to support an affirmative answer to the second punishment issue under Tex.Code Crim.Proc.Ann. art. 37.071(b)(2). *See, Dinkins v. State*, 894 S.W.2d 330, 358 (Tex.Cr. App.1995); *Wilkerson v. State*, 881 S.W.2d 321, 335–336 (Tex.Cr.App.1994) (Baird, J., dissenting); *Johnson v. State*, 853 S.W.2d 527, 532 (Tex.Cr.App.1992); *Valdez v. State*, 776 S.W.2d 162, 166–167 (Tex.Cr.App.1989). These factors were first enumerated in *Keeton v. State*, 724 S.W.2d 58, 61 (Tex.Cr.App. 1987), and include, but are not limited to:

(1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or in concert with other parties;

(2) the calculated nature of the defendant's actions;

(3) the forethought and deliberateness exhibited by the crime's execution;

(4) the existence of a prior criminal record and the severity of the prior offenses;

---

10. A similar instruction was included in the charge to the jury on guilt/innocence.

11. Notwithstanding this, this point of error fails on its merits also. As stated, Texas Rule of Criminal Evidence 607, which is the same as its federal counterpart, allows for the credibility of a witness to be attacked by any party, including the party calling him.

Prior to the promulgation of the rules, the law required a party calling a witness to establish "surprise" or "injury" before the party could impeach its own witness. *See Miranda v. State*, 813 S.W.2d 724 (Tex.App.—San Antonio 1991, pet. ref'd). While this showing is no longer required, the majority of jurisdictions still do not allow prior inconsistent statements to be used under the guise of impeachment for the *primary* purpose of placing substantive evidence before the jury which is not otherwise admissible, the complaint which is advanced here. *See United States v. Hogan*, 763 F.2d 697, 702 (5th Cir. 1985); *Pruitt v. State*, 770 S.W.2d 909, 911 (Tex. App.—Fort Worth 1989, pet. ref'd).

However, the distinction between those cases and the case at bar is this: in each of those cases, the witness had *already* recanted his or her statement in prior sworn testimony at a previous trial or hearing. Therefore the State could be charged with "knowing" that the witness would do the same in their case and thus having the subjective *primary* intent of placing otherwise inadmissible substantive evidence before the jury. Whereas, in the present case, no showing is made of this knowledge on the part of State and thus, there is no evidence of the State's primary intent.

The trend under this latter type of case where primary intent is not shown seems instead to be a resort to a subterfuge analysis conducted in the context of a Rule 403 balancing approach, that the allowing of such "impeachment" would be more prejudicial than probative. *See Miranda, supra*. However, since no such objection was made in this case, we need not determine whether this sort of analysis would produce a different result.

(5) the defendant's age and personal circumstances at the time of the commission of the offense;

(6) whether the defendant was acting under duress or intoxication or under the domination of another at the time of the commission of the offense;

(7) the lack of psychiatric evidence concerning future dangerousness; and,

(8) any relevant character evidence.

*Dinkins*, 894 S.W.2d at 358.

Although no single factor is dispositive toward supporting a jury's affirmative answer to the second punishment issue, "a review of the sufficiency of the evidence to support a finding of a continuing threat necessarily involves a balancing between the aggravating and mitigating evidence presented at trial." *Wilkerson*, 881 S.W.2d at 336 (Baird, J., dissenting). Accordingly, "while the absence of certain aggravating evidence might not render the evidence insufficient to support an affirmative answer to the second punishment issue, the overwhelming presence of mitigating evidence may." *Id.*

## II.

A review of the evidence in light of the aforementioned factors supports the jury's finding that appellant constitutes a future danger to society. With regard to the circumstances and deliberateness of the offense, it is notable that appellant shot the deceased four times at close range after the deceased refused to hand over any money. In *Dinkins*, this court observed that the "infliction of multiple wounds at close range indicates and wanton and callous disregard for human life...." *Id.*, 894 S.W.2d at 360. The infliction of multiple wounds also indicates deliberateness on the part of a defendant. *Id.* *See also, Johnson v. State*, 853 S.W.2d 527, 531–533 (Tex.Cr.App.1992) (multiple gun shot wounds probative of deliberateness of actions). *Compare, Bower v. State*, 769 S.W.2d 887, 890, 895 (Tex.Cr.App.1989) (multiple

gunshot wounds fired at close range). These factors militate against appellant.

Moreover, evidence of a defendant's calculation and forethought in committing an offense is likewise indicative of future dangerousness. In the instant case, the State presented evidence that appellant coincided the robbery to occur in the morning, when the deceased opened his store, and at a time of the month when the deceased had large sums of cash on the premises. *See, Dinkins*, 894 S.W.2d at 360–361 (Defendant arranged for meeting with victim and armed self in preparation); *Bower*, 769 S.W.2d at 895 (Defendant pre-planned burglary and ambushed victims rather than flee when opportunity existed); *and, Livingston*, 739 S.W.2d at 340 (Defendant waited for victim to return to car). Accordingly, this evidence militates against appellant.

Additionally, appellant's prior criminal record and the severity of those offense is probative of whether he may constitute a continuing future danger to society. *Dinkins*, 894 S.W.2d at 361; *and, Wilkerson*, 881 S.W.2d at 339 (Baird, J., dissenting). Although the State presented evidence of nine prior offenses committed by appellant, many of which involved time in prison or jail, it is notable that none of the offenses involve violence.[1] Accordingly, while the majority contends these offenses "show an escalating and on-going pattern of disrespect and continued violations of the law," I do not believe these offenses, as such, are indicative that appellant would constitute a future danger to society. *Compare, Wilkerson*, 881 S.W.2d at 339–340 (Baird, J., dissenting) (numerous violent unadjudicated offenses committed as part of crime spree constituted aggravating factors); *Russell v. State*, 598 S.W.2d 238, 255 (Tex.Cr.App.1980) (Defendant, who was on parole when committing the capital offense, had prior criminal record including burglary, robbery, and assault with intent to murder); *and, Brooks v. State*, 599 S.W.2d 312 (Tex.Cr.App.1979) (Defendant's prior

---

1. These offenses consisted of: (1) burglary of a motor vehicle (August 1982—probated sentence subsequently revoked); (2) possession of marihuana (September 1985); (3) unauthorized use of a motor vehicle (December 1985); (4) delivery of marihuana (May 20, 1986); (5) delivery of marihuana (May 22, 1986); (6) unlawfully carrying a weapon (knife) (June 1987); (7) trespass of a building (November 1988); (8) unauthorized use of a motor vehicle (August 1988); and (9) possession of a controlled substance (cocaine) (April 1989).

criminal record contained only conviction for "simple burglary," theft over $50 and three federal convictions for illegal possession of a firearm).

Evidence of a defendant's age at the time of the offense is also a relevant consideration to whether a defendant constitutes a future danger to society. *Wilkerson,* 881 S.W.2d at 340–341 (Baird, J., dissenting op.). The United States Supreme Court has repeatedly approved of the consideration of a defendant's youth at the time of the offense because the impetuous qualities associated with youth are typically mollified by age and maturity. *Johnson v. Texas,* 509 U.S. ——, 113 S.Ct. 2658, 2668–2669 (1993); *Thompson v. Oklahoma,* 487 U.S. 815, 835, 108 S.Ct. 2687, 2698 (1988); *and, Eddings v. Oklahoma,* 455 U.S. 104, 115–116, 102 S.Ct. 869, 877 (1982). *See also, Graham v. Collins,* 509 U.S. ——, ——, 113 S.Ct. 892, 924 (1993) (Souter, J., dissenting). Accordingly, "youth, by its very nature is a mitigating factor to be noted and considered." *Ellason v. State,* 815 S.W.2d 656, 663 (Tex.Cr.App.1991). The record indicates appellant was 26 years old when he committed the instant offense. Although we have never held there to be an upper limit to when a defendant's age ceases to be a mitigating factor, it is notable that appellant was older than the defendants in those cases in which we have held age to be mitigating. *See, Id., supra* (19); *Huffman v. State,* 746 S.W.2d 212 (Tex.Cr.App.1988) (22); *Beltran v. State,* 728 S.W.2d 382 (Tex.Cr.App.1987) (25); *and, Warren v. State,* 562 S.W.2d 474 (Tex.Cr.App.1978) (25). *See also, Wilkerson,* 881 S.W.2d at 341 (Baird, J., dissenting op.) (19).

Additionally, evidence of appellant's good or bad character is relevant to a review of the sufficiency of the evidence to support a finding of a continuing threat to society. *See, Dinkins,* 894 S.W.2d at 361. Both the State and appellant presented character evidence. An officer in the Corpus Christi Police Department testified from his own experience, as well as knowledge from conversations he had with other officers that appellant was *not* a peaceful and law-abiding citizen. Moreover, three Harris County jailers testified about appellant's participation in two separate alterations between inmates. Finally, appellant's mother testified appellant had admitted to having a cocaine addiction between 1989 and 1991 and that she had observed appellant use marihuana during that period. However, appellant's mother also testified appellant had never been violent or abusive towards his parents. Moreover, appellant's half-brother testified that appellant was non-violent in character. Finally, the supervisor at appellant's full-time job testified appellant was non-violent, hard working, and had occasionally served in an advisory capacity in her absence. While the latter evidence of good character militates against the jury's verdict, it is notable that such evidence was rebutted. However, even unrebutted evidence of a defendant's good character is by itself insufficient to overcome a jury's affirmative answer. *Dinkins,* 894 S.W.2d at 361; *and, Rosales v. State,* 841 S.W.2d 368, 382 (Tex.Cr.App.1992).

Finally, there is no evidence appellant was acting under the influence or dominion of another when he committed the instant offense. *Wilkerson,* 881 S.W.2d at 341. Nor is there any contention appellant was intoxicated at the time of the offense. *Id.,* at 341–342. Although neither side presented psychiatric evidence relating to whether appellant posed a future danger, we have held the absence of psychiatric evidence does not automatically undermine a jury's affirmative answer to the second punishment issue. *Dinkins,* 894 S.W.2d at 361; *and, Rosales,* 841 S.W.2d at 382.

### III.

In weighing the factors enunciated in *Keeton,* I believe the evidence supports the conclusion that a rational trier of fact could find beyond a reasonable doubt that appellant was a future danger to society. Appellant entered the store and shot the deceased four times at close range, displaying a callousness and deliberateness to the crime. Moreover, there is evidence appellant pre-planned the offense to occur at a time when the store would have large sums of money. Although appellant's prior criminal history is relatively minor, there is also (admittedly contested) evidence of appellant's bad character, includ-

ing instances of violence while incarcerated. Finally, appellant was 26 years old when he committed the offense. In light of appellant's age coupled with his periods of incarceration, appellant lacked the youthful immaturity necessary for the purposes of mitigating against the death penalty.

With these comments, I concur in the resolution of appellant's third point of error and join the remainder of the majority opinion.

OVERSTREET and MALONEY, JJ., join this opinion.

