# Court of Appeals
## Tenth Appellate District of Texas

═══════════
10-24-00232-CR
═══════════

Tony Bernard Wooldridge,
Appellant

v.

The State of Texas,
Appellee

═══════════

On appeal from the
413th District Court of Johnson County, Texas
Judge John Wilson Weeks, presiding
Trial Court Cause No. DC-F202400376

═══════════

JUSTICE HARRIS delivered the opinion of the Court.

## MEMORANDUM OPINION

Tony Bernard Wooldridge was convicted of one count of stalking and two counts of attempted kidnapping. The jury assessed punishment at 25 years, five years, and five years, respectively, in prison, and the sentences were ordered to run concurrently. We affirm the trial court's judgments.

**BACKGROUND**

In August of 2022, the Keene Police Department learned that two

teenaged girls were separately approached within one day of each other and in the same neighborhood by a black man in a black car and were ordered to get in his car. The Department also learned that one of the girls had been approached by the same man at least seven other times. That girl identified Wooldridge as the man who approached her.

## SUFFICIENCY OF THE EVIDENCE

In his first two issues, Wooldridge contends the evidence is insufficient to support each of his convictions.

The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

> When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017). This standard requires the appellate court to defer "to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. We may not re-weigh the evidence or substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). The court conducting a sufficiency review must not engage in a "divide and conquer" strategy but must consider the cumulative force of all the evidence. *Villa*, 514 S.W.3d at 232. Although juries may not speculate about the meaning of facts or evidence, juries are permitted to draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial. *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016) (*citing Jackson*, 443 U.S.

at 319); *see also Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). We presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). This is because the jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13.

We measure whether the evidence presented at trial was sufficient to support a conviction by comparing it to "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*; *see also Daugherty v. State*, 387 S.W.3d 654, 665 (Tex. Crim. App. 2013). The "law as authorized by the indictment" includes the statutory elements of the offense and those elements as modified by the indictment. *Daugherty*, 387 S.W.3d at 665.

*Zuniga v. State*, 551 S.W.3d 729, 732-33 (Tex. Crim. App. 2018).

### *Evidence—G.B.*

Over the course of a month, beginning in July and ending in August of 2022, G.B., a nineteen-year-old with cognitive and developmental delays, was approached at least eight times, while she walked in the afternoons or evenings in her neighborhood, by a man driving a medium-sized black vehicle. The first

time the man approached her, he tried to lure her into his car by offering her a chocolate bar. On August 20, 2022, the last time the man approached her, he pulled over and ordered her to get in his car. G.B. told him, "no, I don't want to," and she walked away. The man became upset, exited the car, went around the car, and yelled at her to "get in [his] f*****g car." Because another car was approaching, the man returned to his car and sped away.

G.B. stated that each time the man approached her, he approached in his car from behind her. He would always stop and watch her which would get her attention. She always saw duct tape and yard tools, some big and some small, in his front passenger seat. Each time, the encounters left her feeling scared and uncomfortable because the man knew where she was—he knew her routine.

G.B. described the man as an older black male with no facial hair at that time and wearing a red ballcap. Although the man had the cap pulled down low on his head, she saw his eyes. G.B. took a "live" photograph of the back of the vehicle as Wooldridge left the last encounter which G.B. described as a black four-door vehicle with a little paint missing on the passenger side. She showed the photograph to her mother after her mother read to her a Facebook post by the Keene Police Department describing a suspicious circumstance. G.B.'s mother alerted law enforcement.

G.B. identified Wooldridge from a photo lineup as the person she encountered. Using the photograph G.B. took of the car, officers then traced it to a black Chevrolet Cobalt registered to Wooldridge.

### *Evidence—M.R.*

M.R., a fourteen-year-old, was approached while walking her dog in the evening on August 21, 2022, in the same area as where G.B. was approached. A man in a black car pulled up beside her, stopped, and ordered her to get in the car. His car window was already rolled down. She replied, "What?" because she was not expecting someone to say that to her. The man again ordered her to get in the car. She felt scared and began to run away. When she reached a stop sign, she looked back and saw the man leaning his head out of the driver's window, pointing at her as if trying to get her to come back to him. After that, he drove off. M.R. ran to the park and called her father. The encounter with the man seemed to M.R. to happen quickly, taking 30 seconds to a "minute and a half."

M.R. was shocked and scared because she was by herself and did not know what to do. She was also shocked that the man would say what he said to a person who was alone. According to her father, M.R. was crying and sounded very scared and frantic when she called him. When he reached M.R. at the park, she was still crying and was very upset.

M.R. described the suspect as a black male, with gray, short facial hair, and "creepy," driving a black car with some small scratches on it. At trial, she did not remember how many doors the car had, but it did not surprise her that she told officers after the incident that the car had four doors. She also did not recall telling officers that the man was bald or that the paint on the car was peeling.

### *Attempted Kidnapping*

Taking his second issue first, Wooldridge contends the evidence is insufficient to support his convictions for attempted kidnapping as to both G.B. and M.R. because the evidence failed to establish acts amounting to more than mere preparation and because GPS evidence contradicted G.B.'s and M.R.'s accounts of Wooldridge stopping his vehicle to interact with them.

A person commits the offense of kidnapping if the person intentionally or knowingly abducts another person. TEX. PENAL CODE § 20.03(a). A person commits an attempt if, "with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended." *Thornton v. State*, 425 S.W.3d 289, 300 (Tex. Crim. App. 2014) (quoting TEX. PENAL CODE § 15.01(a)). It is well established that the attempt statute does not require every act short of actual commission to be accomplished in order for one to be convicted of an attempted

offense. *Gibbons v. State*, 634 S.W.2d 700, 706 (Tex. Crim. App. 1982). Criminal attempt involves crossing an imaginary line that separates mere preparatory conduct from "an act which tends to effect the commission of the offense." *Flournoy v. State*, 668 S.W.2d 380, 383 (Tex. Crim. App. 1984). The intent of the statute is to punish action for the intended offense while allowing intervention before an act which could constitute the offense itself occurs. *Swenson v. State*, 707 S.W.3d 297, 303 (Tex. Crim. App. 2024) (internal quotations omitted).

Wooldridge argues there is no evidence showing he exited his vehicle, brandished a weapon, physically restrained either victim, made more threats to them, followed them, blocked their path, or made physical contact. He cites no authority, and we have found none, requiring these specific actions to support a conviction for attempted kidnapping. While there does not appear to be a strict formula to distinguish mere preparation and criminal attempt, a rational jury could have found beyond a reasonable doubt that Wooldridge's actions of ordering G.B. and M.R. more than once to get in the car, having duct tape and tools in his car, exiting the car to yell at G.B., and leaning out of the car window, pointing at M.R., indicate a specific intent to commit kidnapping that went beyond mere preparation.

Wooldridge also asserts that GPS data contradicts G.B.'s and M.R.'s

testimony that Wooldridge stopped to interact with them. He contends that because the GPS electronic monitor he wore indicated average speeds between location "pings" at higher rates of speed than if he had stopped to interact with the victims, the victims could not be believed.

The State introduced data from Wooldridge's electronic monitor GPS system which placed him in the location of each encounter with each victim at the time and place each had reported. According to Wooldridge's parole officer, the monitor system pinged every minute that Wooldridge was moving. On a Google Map, the system showed Wooldridge's average speed in between pings. If Wooldridge stopped for more than a minute, the system would have pinged a second time at the stopped location with an average speed of zero. If he stopped for less than 60 seconds, the system would not have shown a stop or a speed of zero or how long he stopped.

The State's evidence showed an average speed in between two pings of eight miles an hour at the time of M.R.'s encounter and 31 miles an hour at the time of G.B.'s encounter. The detective investigating the cases determined that the interaction with Wooldridge described by G.B. and M.R. could have occurred within a minute. Additionally, G.B. took a photo of the back of Wooldridge's car as it was speeding away one minute after the time the GPS system placed Wooldridge at the location where G.B. said she last encountered

him. M.R. made a phone call to her father one minute after the time the GPS system placed Wooldridge at the location where M.R. said she encountered him.

Thus, a rational jury could have determined that simply because the average speed between each ping was higher than zero did not mean that Wooldridge could not have interacted with each victim and could have believed that the average speeds indicated how fast Wooldridge left each scene. Further, even though Wooldridge's father and sister testified that Wooldridge's car had a manual transmission and manual windows, the jury could have believed that those inconveniences would not have made the encounters impossible as argued by Wooldridge at trial.

Accordingly, reviewing the evidence in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that the evidence established acts by Wooldridge which amounted to more than mere preparation in attempting to kidnap both G.B. and M.R. and that the GPS evidence did not contradict G.B.'s and M.R.'s accounts of the offenses. Wooldridge's second issue is overruled.

### *Stalking*

In his first issue, Wooldridge contends the evidence is insufficient to support his conviction for stalking G.B.

As modified by the indictment in this case, a person commits the offense of stalking if that person on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person, knowingly engages in conduct that: constitutes an offense under Section 42.07, or that the actor knows or reasonably should know the other person will regard as threatening: bodily injury or death for the other person; and would cause a reasonable person to: fear bodily injury or death for himself or herself; or feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended. TEX. PENAL CODE § 42.072(a)(1)(A), (3)(A), (D).[1] Wooldridge only contests the evidentiary sufficiency of the "on more than one occasion" element, asserting the State did not provide evidence beyond G.B.'s "bare assertion" that more than one encounter with Wooldridge occurred.

G.B. testified that over the course of a month, beginning in July and ending in August, she was approached at least eight times by a man driving a medium-sized black vehicle while she walked in the evenings in her neighborhood. Later, G.B. identified Wooldridge from a pretrial photo lineup and again in court as the man who approached her those eight times. The first time Wooldridge approached her, he tried to lure her into his car by offering

---

[1] This Penal Code provision was modified in 2023. The modification applies only to offenses committed after the effective date of the modification, September 1, 2023. *See* Acts 2023, 88th Leg., ch. 947 (S.B. 1717), § 3. Because this offense occurred in 2022, we use the statute in effect at the time the offense was committed; that being, Acts 2013, 83rd Leg., ch. 1278 (H.B. 1606), § 2.

her a chocolate bar.  The last time Wooldridge approached her, he ordered her to get in his car, and when she refused, he exited his car, walked around it, and yelled at her to get in the "f*****g car."  G.B. also testified as to what occurred each time she encountered Wooldridge:  he always approached in his car from behind her; he always stopped and watched her; and she always saw duct tape and yard tools in his front passenger seat.

Wooldridge complains that G.B.'s statements were too general and faults the State for not corroborating them with evidence such as "surveillance footage, police reports, GPS data, or any other evidence whatsoever."  But Wooldridge presents no authority, and we have found none, that requires such corroboration.

G.B. testified as to specifics of the first and last encounters and as to what always occurred at each encounter which necessarily included all the encounters in between.  Thus, reviewing the evidence in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that the evidence was sufficient to prove the "on more than one occasion" element.  Accordingly, Wooldridge's first issue is overruled.

**MOTIONS FOR CONTINUANCE**

In his third issue and part "a" of his fifth issue,[2] Wooldridge complains

---

[2] The fifth issue combines discussions of two different motions—a motion to dismiss the indictment and a motion for continuance—which were denied during successive hearings before voir dire.  We

the trial court erred in denying two different motions for continuance regarding Count Three of the indictment —the attempted kidnapping of M.R. One motion concerned a possible alternate suspect for Count Three who had, according to Wooldridge, recently been discovered (Issue Three), and the other motion concerned alleged exculpatory evidence which, also according to Wooldridge, had not been provided to him (Issue Five, part "a").

A criminal action may be continued on the written, sworn motion of a party for sufficient cause shown. TEX. CODE CRIM. PROC. arts. 29.03; 29.08. A trial court's denial of a motion for continuance is reviewed for an abuse of discretion. *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007). To establish reversible error based on the denial of a motion for continuance, a defendant must show both that the trial court erred in denying the motion and that the lack of a continuance caused harmed. *Gonzales v. State*, 304 S.W.3d 838, 843 (Tex. Crim. App. 2010).

### *Alternate Suspect*

Wooldridge filed a sworn motion for continuance on the afternoon of the third day of trial. In it, he claimed he recently became aware of a separate individual living in the area who matched the description of the perpetrator of

---

have separated the issue into a part "a," being the motion for continuance, combining its discussion with Issue Three, and into part "b," being the motion to dismiss, combining its discussion with Issue Four.

the offense against M.R. and who drove a car similar to the one described by M.R.

A hearing was held on the motion and a witness, Steven Allen, Wooldridge's nephew, testified that after listening to testimony on the first day of trial, he believed the description of the person mentioned in the Keene Police Department's Facebook post to be "identical" to a person he knew as "Wes" who drove a black four-door Honda with dents in it.

On appeal, Wooldridge contends Allen's testimony was not merely speculative because it showed that the person Allen knew matched M.R.'s description of the man who approached her. Allen's testimony showed otherwise.

Allen never said the full name of the person he knew—he only said "Wes." He did not place Wes in Keene at the time M.R. was approached; he only said that Wes could have been in Keene when "dealing with" a girl who lived near Wooldridge and the "area within question" and who had reported Wes for "quote/unquote 'stalking.'" Allen also described Wes as going through phases where he would "go bald," meaning, he would shave off "everything," including his head and face and do irrational things. However, there was no testimony that Wes was going through one of those phases in August of 2022. Allen also never said that Wes was in one of these phases when he was "dealing

with" the girl in Keene.

Further, Allen was shown a photograph of a man whom he identified as Wes when he appeared "normal." The record reflects that in the photo, Wes was not bald. Allen was also shown the photograph of the person whom M.R. identified in a pretrial photo lineup as the man who approached her. The record reflects that this man was much older and darker complected than Wes. Allen believed that maybe the nose, chin, and cheek of Wes resembled the man identified, but he agreed they were different in age.

Based on this evidence, the trial court could have determined that Allen's testimony was speculative and that Wes did not match the description of M.R.'s assailant.[3] Accordingly, we cannot say that the trial court abused its discretion in denying this motion for continuance. Issue Three is overruled.

### *Exculpatory Evidence*

In part "a" of his fifth issue, Wooldridge complains the trial court erred in denying a motion for continuance, sworn-to and filed before voir dire, because new, exculpatory evidence had not been turned over to him or his attorney.

Wooldridge argues the State violated its duty under *Brady v. Maryland*,

---

[3] At the time of the hearing, the trial court had already heard M.R.'s testimony describing the man who approached her and the police officer's testimony of M.R.'s description of the man moments after the incident occurred.

373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) to disclose exculpatory evidence, and thus, the trial court erred in failing to give counsel adequate time to review the evidence and incorporate it into the defensive strategy.

The alleged exculpatory evidence was an officer's body-cam video which captured the explanation of the lineup procedure and then M.R.'s review of the photos. The video also showed which photo M.R. identified as the man who had approached her. M.R. did not identify Wooldridge. Wooldridge's lead counsel argued that he learned of the body-cam video the morning of trial before voir dire. But the State asserted, and no one disputed, that the body-cam video had been delivered to co-counsel for the defense two weeks before trial.[4] Thus, Wooldridge had two weeks to investigate the person whom M.R. identified if needed. Further, the body-cam video was introduced into evidence at trial, and Wooldridge was able to use the video for his defense.

If evidence is turned over in time for the defendant to use it in his defense, the defendant's *Brady* claim fails. *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999). A conviction should not be reversed just because it was not disclosed as early as it might have and should have been. *U.S. v. McKinney*, 758 F.2d 1036, 1050 (5th Cir. 1985); *Little*, 991 S.W.2d at 866.

---

[4] At the hearing, co-counsel said he viewed the video, and the trial court acknowledged that co-counsel said he knew about the video.

Accordingly, based on the record, we cannot say that the trial court abused its discretion in denying this motion for continuance. Part "a" of Wooldridge's fifth issue is overruled. [5]

**DUE PROCESS VIOLATION/MOTION TO DISMISS**

Wooldridge next asserts in his fourth issue that the State violated his due process rights under *Brady v. Maryland*, 373 U.S. 83, 87 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) by failing to preserve the photo lineup used by M.R. and in part "b" of his fifth issue, that the trial court abused its discretion in denying Wooldridge's motion to dismiss Count Three of the indictment for the same reason. We discuss both of these complaints together.

### *Dismissal Standard of Review*

A trial court may dismiss a charging instrument to remedy a constitutional violation; however, this is a drastic action only to be used in the most extraordinary circumstances. *State v. Mungia*, 119 S.W.3d 814, 817 (Tex. Crim. App. 2003). Therefore, the trial court does not abuse its discretion in denying a motion to dismiss a charging instrument without the consent of the

---

[5] Wooldridge also mentioned in his brief that the State violated the Michael Morton Act by its "last minute disclosure" of the body-cam video. But this was not an allegation in Wooldridge's motion for continuance, nor was it discussed with the trial court at the hearing. Further, Wooldridge did not brief what the Act requires or how the State violated it. Thus, this part of his argument is waived for the failure to bring it to the trial court's attention, *see Glover v. State*, 496 S.W.3d 812, 816 (Tex. App.— Houston [14th Dist.] 2016, pet. ref'd), and for being inadequately briefed. *See* TEX. R. APP. P. 38.1. We are not required to make an appellant's arguments for him. *See Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011) (*citing Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008)); *Neville v. State*, 622 S.W.3d 99, 104 (Tex. App.—Waco 2020, no pet.).

State when there is no constitutional violation, or even if the defendant's rights were violated, when dismissal of the indictment was not necessary to neutralize the taint of the unconstitutional action. *See id.*; *State v. Terrazas*, 962 S.W.2d 38, 42 (Tex. Crim. App. 1998).

### *Supporting Facts*

Two days after the offense occurred against M.R., a Keene Police Department officer went to M.R.'s home to show her a photo lineup of potential suspects. The officer who presented the lineup to M.R. did not know Wooldridge and did not know if his picture was in the photo array. The officer was wearing a body camera when he presented the lineup to M.R. and captured the entire procedure on that camera including the photograph of the person M.R. identified as the potential offender. The body-cam video was admitted into evidence and played for the jury.

A detective from the Keene Police Department who knew Wooldridge accompanied the officer to M.R.'s house but did not view the photos ahead of time and did not participate in presenting them to M.R. The detective did not review the lineup until after he returned to his office at the Keene Police Department. At that time, he learned that M.R. did not identify Wooldridge. He then emailed his direct supervisor, because he was working the night shift, advising the supervisor that one victim did not identify Wooldridge and that

the photo array was on his desk. When he returned to work, the array was no longer on his desk. Wooldridge was eventually indicted on the offense against M.R. two years later and only two months before trial. As of trial, the photo lineup had not been located.

### Lost or Destroyed Evidence

The Due Process Clause of the Fourteenth Amendment requires the State to disclose to criminal defendants favorable evidence that is material either to guilt or to punishment. *California v. Trombetta*, 467 U.S. 479, 480-81, 104 S. Ct. 2528, 2529-30 (1984); *United States v. Agurs*, 427 U.S. 97 (1976); *Brady v. Maryland*, 373 U.S. 83 (1963). To establish a due process violation arising from the loss or destruction of evidence by the State, an appellant must show that the evidence was material and favorable in that it both possessed an exculpatory value that was apparent before the loss or destruction and was of such a nature that the accused would be unable to obtain comparable evidence elsewhere. *See California v. Trombetta*, 467 U.S. 479, 104 S. Ct. 2528, 2534, 81 L. Ed. 2d 413 (1984); *San Miguel v. State*, 864 S.W.2d 493, 495 (Tex. Crim. App. 1993).

At the time the detective knew M.R. had not identified Wooldridge, Wooldridge had not been charged with an offense against M.R. That occurred two years later and the array had potentially already been misplaced. Thus,

it was not apparent before its loss that the photo lineup possessed an exculpatory value. Even if it was apparent, Wooldridge obtained comparable evidence, two weeks before trial, through the officer's body-cam video which showed the person M.R. identified. The State had no duty under the Due Process Clause to memorialize exculpatory or mitigating circumstances in any particular fashion such as the physical photo lineup. *San Miguel*, 864 S.W.2d at 495 (Tex. Crim. App. 1993). Accordingly, the State did not violate Wooldridge's constitutional due process rights.

### *Conclusion*

Because there was no constitutional violation, the trial court did not abuse its discretion in denying Wooldridge's motion to dismiss. Wooldridge's fourth issue and part "b" of his fifth issue are overruled.

## PRETRIAL IDENTIFICATION PROCEDURE

In his sixth and final issue, Wooldridge complains that the trial court erred in denying his pretrial motion to suppress the pretrial photo lineup used by G.B. to identify Wooldridge because the lineup procedure was impermissibly suggestive and resulted in a substantial likelihood of misidentification in violation of his due process rights. We disagree with Wooldridge.

In considering the scope of due process rights afforded a defendant regarding the admission of identification evidence, the United States Supreme

Court has held that a pretrial identification procedure may be so suggestive and conducive to mistaken identification that the subsequent use of that identification at trial would deny the accused due process of law. *Stovall v. Denno*, 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 (1967); *Conner v. State*, 67 S.W.3d 192, 200 (Tex. Crim. App. 2001); *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995). Consequently, the Supreme Court formulated a two-step analysis to determine the admissibility of an in-court identification: 1) whether the out-of-court identification procedure was impermissibly suggestive; and, if suggestive, 2) whether that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968); *Conner*, 67 S.W.3d at 200; *Barley*, 906 S.W.2d at 33. An analysis under these two steps requires an examination of the "totality of the circumstances" surrounding the particular case and a determination of the reliability of the in-court identification. *Conner*, 67 S.W.3d at 200; *Barley*, 906 S.W.2d at 33. The defendant must prove both elements by clear and convincing evidence. *Barley*, 906 S.W.2d at 33-34. Generally, we review the trial court's decision in this type of situation *de novo*. *See Gamboa v. State*, 296 S.W.3d 574, 581-82 (Tex. Crim. App. 2009).

In this case, the photo lineup was given to G.B. four days after the

attempted kidnapping. The lineup consisted of six individual photographs, with each photograph in its own manilla folder. The lineup photos were generated by the Texas Department of Public Safety, not the Keene Police Department. The six folders were given to G.B. who reviewed them, one at a time. Nothing was written on the photos when they were given to G.B.

The officer who administered the lineup procedure to G.B. read from form instructions provided by DPS. He did not tell G.B. that Wooldridge was in the lineup. Based on the form instructions, he informed G.B. that Wooldridge may or may not be in the lineup. The officer did not know Wooldridge and did not know anything about the case except to be on the lookout for a black male in a particular type of vehicle. He did not know in what order G.B. reviewed the photos. He did not know which photo she reviewed at which time. G.B. signed a photo which she identified as the person who stalked and attempted to kidnap her. The officer did not instruct, encourage, or influence G.B. to sign that particular photo.

G.B.'s mother was the only person other than the administering officer in the room with G.B. while G.B. reviewed the photos. The lineup was not shown to G.B.'s mother. At times, G.B. looked up from the photos and at her mother; but the officer stated, and the officer's body-cam verified, there was no ability for the mother to know what photo G.B. was viewing.

Wooldridge contends the lineup was impermissibly suggestive because the photos were not all similar: some had slightly different backgrounds; some persons depicted in the photos may have appeared younger than Wooldridge; some persons had different complexions; and some photos were more in focus than others. However, each photo was represented to be a Texas Driver's License photo. It was also represented that not all driver's licenses have the same color of background or the same quality of photograph. A testifying Keene Police Department detective did not believe any of the variations or differences in complexion or age were made to highlight or influence G.B.'s identification of Wooldridge's photograph in the lineup.

Accordingly, after a *de novo* review of the evidence presented at the motion to suppress hearing, and based on a totality of the circumstances, we find that Wooldridge did not prove by clear and convincing evidence the pretrial identification procedure used to help G.B. identify Wooldridge as the person who stalked and attempted to kidnap her was impermissibly suggestive. Because of this determination, we need not proceed to review the second step in the U.S. Supreme Court's analysis. *See Barley v. State*, 906 S.W.2d 27, 34 (Tex. Crim. App. 1995). Wooldridge's sixth issue is overruled.

**CONCLUSION**

Having overruled each issue on appeal, we affirm the trial court's

judgments.

                                    _____
                                    LEE HARRIS
                                    Justice

OPINION DELIVERED and FILED:  November 20, 2025

Before Chief Justice Johnson,
      Justice Smith, and
      Justice Harris
Affirmed
Do Not Publish
CRPM

