Opinion of February 19, 2009, Withdrawn; Affirmed and Substitute
Memorandum Opinion filed May 21, 2009








Opinion of February 19, 2009, Withdrawn; Affirmed and
Substitute Memorandum Opinion filed May 21, 2009.

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-08-00146-CR

_______________

 

CLARENCE MOORE JR., Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

                                                                                                                                               


On Appeal from the 405th District Court

Galveston County, Texas

Trial Court Cause No. 07CR0773

                                                                                                                                                

 

S U B S T I T U T E   M E M O R A N D U M   O P I N I
O N

We
withdraw our memorandum opinion of February 19, 2009, and issue this substitute
memorandum opinion in its place.  See Tex. R. App. P. 19.3(a) (permitting court, after
expiration of plenary power, to correct clerical error in opinion).








A jury
found appellant, Clarence Moore Jr. guilty of aggravated robbery and assessed
punishment at thirty years= confinement and a $1,000 fine.  In five issues, appellant
contends the trial court erred by (1) refusing to grant his motion to inspect
the State=s records pertaining to prospective jurors, (2) failing to dismiss the
charge on the basis of factual insufficiency, (3) admitting identification
evidence, (4) not allowing him to exercise additional peremptory challenges,
and (5) admitting evidence at the punishment phase. Because our
disposition is based on clearly settled law, we issue this memorandum opinion
and affirm.  See Tex. R. App. P. 47.4.

I.  Factual and Procedural Background

On the
evening of December 12, 2006, two men robbed Catherine Cockerham at gunpoint
while she was working at a game room in Texas City.  Using the videotape from a
surveillance camera, investigators identified appellant as a possible suspect. 
Cockerham subsequently selected appellant=s photograph from a six-photo array,
and appellant was charged with aggravated robbery.

Appellant
filed a pretrial motion requesting the court to prohibit the State=s use of computers.[1] 
In relation to use of computers during voir dire, appellant argued (1) the
State might attempt to discover whether one or more venirepersons had a record
of arrests or criminal convictions, (2) appellant did not have access to such
data, and (3) as a result, the State would have an unfair advantage in
exercising its strikes and challenges.  The trial court denied the motion.

At the
close of voir dire, the State and appellant struck nine venirepersons by
agreement in lieu of asking them additional questions.  Each side then listed
its peremptory strikes, and the trial court observed appellant had struck nine
persons from the main panel and two from the alternate list.  Appellant
responded that he understood the peremptory strikes were for the entire panel. 
The court then explained the law provided for ten strikes for the main panel
and one strike for the alternate list.  Appellant objected, and the trial court
overruled the objection.  Neither of the two prospective alternates served.








At
trial, Cockerham testified she was working at Sonny=s Game Room in Texas City on December
12.  She worked alone although her husband was present to keep her company. 
Around 9:30 p.m., appellant entered the game room.  Cockerham had never seen
appellant before.

Appellant
told Cockerham he was looking for his grandmother.  Cockerham told appellant
his grandmother was not there, but might be at one of the other local game
rooms.  Appellant said he did not know the location of one of the game rooms. 
Cockerham reached under the counter and took a piece of paper from a new
package of paper she had bought earlier that day.  She gave the paper to her
husband, and he drew appellant a map to the game room.  Thanking Cockerham and
her husband, appellant took the map and left.

About an
hour and a half later, appellant came back to Sonny=s and told Cockerham he could not
find the other game room.  Appellant put the hand-drawn map on the counter.  As
Cockerham was trying to explain the directions to appellant, a second man
entered the game room.  The second man was wearing a black hoodie and his
tee-shirt was covering his face, as if he were cold.  The masked man
acknowledged appellant and then came around the counter.  The next thing
Cockerham knew, Athere=s a gun laid on the counter right beside my arm.@  It was a thirty-eight caliber,
snub-nose revolver.

Cockerham
began to step back, but appellant grabbed her  arm and pulled her forward. 
Appellant patted Cockerham=s arm and told her not to worry, that it was Aokay.@   He said they did not want to hurt
anyone.  He told Cockerham all they wanted was the money and then they would
leave.  The masked man took a bank bag containing between $1500 and $1700. 
Appellant put the gun back in his pocket and left with the masked man.

After
the two men left,  Cockerham locked the door and activated the panic button. 
She then waited for the Texas City Police officers.  At that point, the map was
still on the counter.  Cockerham guessed the police collected it.








Outside
the presence of the jury, the State showed Cockerham the photographic lineup
which she had previously viewed.  Cockerham testified the officers had not
indicated which photograph she should choose.  Cockerham testified she had
identified the unmasked man with the gun.  Cockerham testified she had written,
AI believe that this is the man that
robbed me at Sonny=s Game Room,@ beneath the fifth photograph in the lineup (State=s exhibit nineteen).

On
cross-examination, appellant attempted to have Cockerham  agree there were only
two light-skinned black males in the six-person lineup.  Although Cockerham
agreed the men in the photographs did not all have the same skin tone, she also
testified she considered only two were darker.  Appellant questioned Cockerham
on her choice of the word Abelieve@ when she identified his photograph in the lineup.  When
appellant suggested this term meant Cockerham had a doubt, Cockerham answered
she Areally didn=t.@

Appellant
objected to the photographic lineup because Cockerham did not positively 
identify him.   He then moved to suppress the identification evidence. 
Appellant argued four  photographs were of dark skinned men and only two were
of lighter skin tone.  Therefore, he contended, Cockerham had a fifty-fifty
chance of identifying him.

In
response, the State asked Cockerham whether, at the present time, she could
identify the man who had not been wearing a mask.  Cockerham responded that she
could.  Appellant again objected, arguing he was the only person sitting at
counsel table who was on trial.  The trial court overruled the objection, and
Cockerham identified appellant.

On
cross-examination, appellant questioned Cockerham about appellant=s build.  Cockerham admitted she
might have been mistaken that appellant was muscular.








Finally,
in response to a question from the court, appellant argued the in-court
identification was based on an unfair photographic spread.  The trial court
overruled appellant=s objections, allowed evidence of the photographic lineup and
the in-court identification, and admitted the photographs.

With the
jury again present, the State showed Cockerham the six photographs from the
lineup.  Cockerham testified she was able to identify the unmasked man with the
gun who robbed her.  She testified that State=s exhibit number nineteen, which was
the fifth photograph she saw, was of appellant.  Cockerham then identified
appellant in the courtroom.

Cockerham
identified State=s exhibit number one as a photograph of the map her husband
drew for appellant.  Cockerham testified that the game room is equipped with a
surveillance system.  She said she took the surveillance recording to the Texas
City Police Department.  The surveillance video was admitted and played for the
jury, with Cockerham explaining what was happening as the recording played.

On
cross-examination, Cockerham agreed that four of the six men in the photographs
had darker skin tone.  She agreed the robber had a lighter skin tone.   Later,
she testified she believed more than two men in the photographs were lighter
skinned.  Cockerham also agreed she had written, AI believe,@ when she had identified appellant. 
Cockerham explained she wrote, AI believe,@ because the detective asked her whether she believed to the
best of her knowledge the photograph was of the person she had seen.  Cockerham
said it was a figure of speech.  Cockerham agreed she had based her
identification on pretty lips, pretty eyes, and a medium muscular build. 
Cockerham explained that she might have been wrong about appellant=s build because he was wearing a
jacket during the robbery.  She testified she could not say whether appellant
had braids because he was wearing a hat.  Cockerham testified that her husband Afor reasons of his own,@ did not identify appellant from the
photographic lineup.  As in the suppression hearing, appellant attempted to
get  Cockerham to say she had guessed when she identified appellant.  Cockerham
testified she did not guess.








Texas
City Patrol Officer Robert Judson Sr. testified he was dispatched to Sonny=s Game Room on December 12, 2006. 
When Judson arrived, he was informed the room had just been robbed.  Judson
spoke to Cockerham.  Judson described Cockerham as hysterical, upset, and very
shaken up.  Judson recovered a white piece of paper with a hand-drawn map from
the counter top near where appellant had stood.

Detective
Ernest Robles was assigned to conduct the follow-up investigation.  Robles
testified he interviewed five or six people and developed leads about the
possible identification of the unmasked man with the gun.  The leads eventually
led Robles to the Webster Police Department, where he contacted Detectives
Jeremy Dailey and James Latham.  Robles showed the surveillance video from the
game room to the Webster detectives.  They both made an identification.  Based
on the Webster detectives= identifications, Robles obtained a photograph of appellant.

Robles
placed appellant=s photograph in a photographic lineup.  He presented the
lineup to Cockerham.  Robles explained he presented a document to Cockerham
before showing her the photo spread.  Robles described the document as
containing four statements which (1) informed Cockerham she would be viewing
the lineup; (2) she should not guess; (3) it is just as important to clear an
innocent person from suspicion as it is to identify the guilty; and (4) she
should not discuss with any witnesses whether she identified someone.  Robles
testified Cockerham identified the robber who was not wearing a mask and who
had the gun.  On cross-examination, Robles testified Cockerham=s husband did not recognize anyone
from the photo lineup.  Robles testified he put the lineup together as fairly
as he could.  Robles disagreed with appellant that there were only two
light-skinned men between whom Cockerham could choose.








Webster
police Detectives Dailey and Latham testified they met with Robles.  The
Webster detectives watched the surveillance video from the robbery at Sonny=s Game Room.  Both detectives
testified they identified appellant as the unmasked man with the gun.  On
cross-examination, Latham said he knew appellant because he had come in contact
with him on several occasions.

Officer
Rodney Todd, of the Texas City Police Department Crime Scene Unit, testified he
processed three sheets of paper, one of which contained a hand-drawn map.  Todd
applied Ninhydrin to the paper, and fingerprints became visible.   Todd
testified if there is no known suspect, the prints would be scanned into their
automated fingerprint identification index (AFIX) to determine whether there is
a match.  Todd explained Galveston police use the automated fingerprint index
system (AFIS), which is more complex than AFIX and is linked to other state and
federal fingerprint databases.  Prints the Texas City department cannot
identify are sent to the Galveston Police Department for entry into AFIS.

Connie
Pearson, of the Galveston Police Department Fingerprint Section, testified that
on June 5, 2007, she received a packet of unknown fingerprints relating to this
case.  She testified she was asked to enter the fingerprints into AFIS. 
Pearson entered the fingerprints into AFIS, but did not receive any matches. 
Pearson testified she was also asked to compare the fingerprints from the map
with appellant=s prints taken from the DPS database.  Pearson made the comparison.  She
found that appellant=s right thumb and third finger matched the fingerprints on
the map.  Pearson stated that, before she came to testify, she had requested
appellant=s fingerprints from the county jail to make another comparison.  Pearson
testified the fingerprints matched.  Pearson identified appellant and testified
she had no doubt the fingerprints on the map were appellant=s.








Texas
City Police Sergeant James Biery  Jr.  testified he entered the fingerprints
from the map into AFIX, but did not receive a match.  Biery then sent the
fingerprints to Pearson for entry into AFIS to compare with appellant=s known prints.  After Pearson=s comparison, Biery testified he
verified Pearson=s findings.  Biery testified appellant=s right middle finger and right thumb
matched the prints from the map.  Biery testified he fully concurred with
Pearson=s findings.

After
the State rested, appellant filed a motion for an instructed verdict. 
Appellant argued the State failed to prove appellant was the robber.  The trial
court denied appellant=s motion.  Appellant did not present a defense.

During
deliberations there were several communications from the jury, including a
request to compare the video surveillance with a mug shot of appellant and a
request to see appellant=s face up close and from the front and side.  The trial court
denied the request.

The jury
found appellant guilty, and the case proceeded to the punishment phase. 
Appellant pleaded true to an enhancement paragraph resulting from a March 12,
1997 Galveston County conviction for delivery of marijuana.  The State then
informed the court it planned to introduce a certified copy of the Galveston
County judgment.[2]  Initially,
appellant did not object.  However, after reviewing the document, appellant
objected to the attached motion to revoke community supervision, which listed a
San Bernadino County, California conviction as the ground for revocation.  The
State replied that the Galveston County judgment incorporated the motion Aby reference for all purposes.@  The trial court overruled appellant=s objection and admitted the
Galveston County judgment with the attached motion.  The jury assessed punishment
at thirty years= confinement and a $1,000 fine.

 

 

 








II.  Discussion

A.        Jury Selection

Issue
one:  denial of the request to allow appellant to inspect the State=s records.  In issue one, appellant argues the
trial court Aerred in refusing to grant [appellant=s] Motion to allow inspection of the
records and acquired information held by the [State] which relate to the juror=s [sic] qualifications to serve on
jury trials held in Galveston County, Texas.@  In the trial court, appellant
initiated this request by written motion asking the court to prevent the State
from using computers during voir dire.  He contended the computerized records
contained information about venire members= arrests and criminal convictions. 
At the hearing on this motion, appellant argued the State should be required to
share the information with appellant or be denied its use.  He did not further
specify the nature of the information at issue.  The trial court denied the
motion.

In this
court, appellant complains he was denied access to information on how venire
members voted in prior trials.  This complaint does not comport with his
complaint in the trial court.  He failed to preserve this issue for review.  See
Tex. R. App. P. 33.1(a)(1)(A); Wilson v. State, 71 S.W.3d 346, 349 (Tex.
Crim. App. 2002).  In addition, with regard to the merits of his complaint, the
State generally has no obligation to furnish defense counsel with information
it has regarding prospective jurors.  See Etheridge v. State, 903 S.W.2d
1, 7 (Tex. Crim. App. 1994).  Accordingly, we overrule appellant=s first issue.

Issue
four: request to use two peremptory strikes against prospective alternate
jurors.  In
issue four, appellant argues the trial court should have permitted him to
exercise additional peremptory challenges.  Specifically, he requested the
trial court to permit him to exercise two strikes against potential alternate
jurors.








AIn non‑capital felony cases . . . , the State and
defendant shall each be entitled to ten peremptory challenges.@  Tex. Code Crim. Proc. Ann. art. 35.15(b) (Vernon 2006).  Article
35.15 also provides:

The State and the defendant shall each be entitled to one peremptory
challenge in addition to those otherwise allowed by law if one or two alternate
jurors are to be impaneled . . . . The additional peremptory challenges
provided by this subsection may be used against an alternate juror only, and
the other peremptory challenges allowed by law may not be used against an
alternate juror.

 

Id. (d).

The
defendant=s request directly contravened the procedure set forth in article
35.15(d).  Accordingly, the trial court correctly denied appellant=s request, and we overrule appellant=s fourth issue.

B.        Trial Issues

Issue
two: sufficiency of the evidence.  In issue two, appellant argues the trial court Aerred when on proper motion by the
Defendant the Trial Court failed to dismiss the charges on the basis of the
factual sufficiency of the evidence presented by [the State] during its phase
of the trial.@  At the close of the State=s case, appellant moved for an
instructed verdict on the ground the State failed to prove he was the robber. 
A challenge to the denial of a motion for instructed verdict is actually a
challenge to the legal sufficiency of the evidence.  Bargas v. State,
252 S.W.3d 876, 886 (Tex. App.CHouston [14th Dist.] 2008, no pet.); see Williams v. State,
937 S.W.2d 479, 482 (Tex. Crim. App. 1996).   In this court, appellant does not
refer to legal insufficiency, but cites the standards for both legal and
factual sufficiency.  See, e.g., Jackson v. Virginia, 443
U.S. 307, 318B19 (1979) (legal sufficiency); Clewis v. State, 922 S.W.2d 126,
129 (Tex. Crim. App. 1996) (factual sufficiency).  We therefore address both
the legal and factual sufficiency of the evidence.








In
considering a legal sufficiency challenge, we review all evidence in the light
most favorable to the finding and determine whether any rational trier of fact
could have found the essential elements of the offense beyond a reasonable
doubt.  King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).  In
examining a factual sufficiency challenge, we view all evidence in a neutral
light and set aside the verdict A>only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.=@  Cain v. State, 958 S.W.2d
404, 407 (Tex. Crim. App. 1997) (quoting Clewis, 922 S.W.2d at 129). 
Before we may reverse for factual insufficiency, we must first conclude, with
some objective basis in the record, that the great weight and preponderance of
the evidence contradicts the jury=s verdict.  Watson v. State,
204 S.W.3d 404, 417 (Tex. Crim. App. 2006).  As the court of criminal appeals
recently explained:

Both legal and factual sufficiency standards require the reviewing
court to consider all of the evidence.  AThe
difference between the two standards is that the former requires the reviewing
court to defer to the jury=s credibility
and weight determinations while the latter permits the reviewing court to
substitute its judgment for the jury=s
on these questions >albeit to a very limited degree.=@ In reality, a Afactual‑sufficiency
review is >barely distinguishable= from a Jackson v. Virginia legal sufficiency review.@

 

Rollerson v. State, 227 S.W.3d 718, 724 (Tex. Crim.
App. 2007) (citations omitted).

Appellant
does not dispute the sufficiency of the evidence on the elements of aggravated
robbery.  Instead, he argues the evidence was insufficient to prove he was the
person who committed the offense.  Identification of the defendant as the
person who committed the offense charged is part of the State=s burden of proof beyond a reasonable
doubt.  Miller v. State, 667 S.W.2d 773, 775 (Tex. Crim. App. 1984).

Viewed
in the light most favorable to the verdict, the following evidence establishes
appellant as the perpetrator of the robbery:   








$                  
When shown the
surveillance video from Sonny=s Game Room, two Webster policemen, one of whom had contact
with appellant on several occasions, identified appellant as the person in the
video;

$                  
Two persons
concluded fingerprints on the hand-drawn map left by the robber matched
appellant=s fingerprints;

$                  
Cockerham
positively identified appellant=s photograph as that of the unmasked man with the gun;

$                  
Although
Cockerham had written beneath appellant=s photo that she Abelieved@ this was the man, she did not have a
doubt about her identification of him and did not guess; and

$                  
Cockerham
identified appellant in court.

Appellant
did not present any evidence, but relies on the following aspects of the State=s case and on his cross-examination
to argue the insufficiency of the evidence:

$                  
Cockerham=s initial description of appellant as
having a muscular build combined with her subsequent admission he was a small
man;

$                  
Varying testimony
regarding the skin tone of the men in the photo array from which Cockerham
selected appellant=s photograph;

$                  
Cockerham=s use of the phrase, AI believe this is the man,@ when she selected appellant=s photo from the array; and

$                  
Cockerham=s husband=s inability to identify appellant
from the photo array.








Considering all the evidence in the light most favorable to
the verdict, we conclude a rational trier of fact could have found the
essential element of identity beyond a reasonable doubt.  See King, 29
S.W.3d at 562.  The
evidence was therefore legally sufficient to prove appellant was the person who
committed the aggravated robbery.

Cockerham=s descriptions of appellant and her
husband=s inability to identify appellant
relate to the credibility and weight of Cockerham=s identification of appellant.  It
was for the jury, as factfinder, to judge the weight and credibility to be
given to witness testimony.  Tran v. State, 221 S.W.3d 79, 87 (Tex. App.CHouston [14th Dist.] 2005, pet. ref=d).  Having viewed all the evidence
in a neutral light, we cannot conclude the great weight and preponderance of
the evidence contradicts the jury=s verdict.  See Watson, 204
S.W.3d at 417.  The evidence was therefore factually sufficient to prove
appellant was the person who committed the aggravated robbery.

Accordingly,
we overrule appellant=s second issue.

Issue
three: admission of identification evidence.  In issue three, appellant
challenges the trial court=s admission of evidence of Cockerham=s identification of appellant as the
person who robbed her.  Appellant contends the out‑of‑court
photographic array was impermissibly suggestive and tainted Cockerham=s in‑court identification.

The
admissibility of an identification is generally a mixed question of law and
fact, which we review de novo.  Loserth v. State, 963 S.W.2d 770, 773
(Tex. Crim. App. 1998); Brown v. State, 29 S.W.3d 251, 254 (Tex. App.CHouston [14th Dist.] 2000, no pet.). 
We follow two steps to determine whether a trial court erred in admitting an in‑court
identification.  Barley v. State, 906 S.W.2d 27, 33 (Tex. Crim. App.
1995).  First, we consider whether the pretrial identification procedure was impermissibly
suggestive.  Id.   Second, if we conclude the procedure was
impermissibly suggestive, we determine whether the procedure gave rise to a
very substantial likelihood of irreparable misidentification.  See id. 
Analysis under these steps requires an examination of the totality of the
circumstances of the case and a determination of the reliability of the
identification.  Id.








Reliability
is the lynchpin in determining the admissibility of identification testimony.  Webb
v. State, 760 S.W.2d 263, 269 (Tex. Crim. App. 1988).  It is appellant=s burden to show by clear and
convincing evidence that the in‑court identification is unreliable.  Delk
v. State, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993).

A photo
array must contain individuals who fit the rough description of a suspect;
however, it is not essential that all individuals be identical.  See Wilson
v. State, 15 S.W.3d 544, 553 (Tex. App.CDallas 1999, pet. ref=d).  But see Tapley v. State,
673 S.W.2d 284, 286 (Tex. App.CSan Antonio 1984, pet. ref=d) (photo spread impermissibly
suggestive when defendant was only Anglo in array).  

In this
court, appellant argues the array was impermissibly suggestive because (1)
appellant was the only person with an oblong face and (2) appellant had a
different length of hair than the other men.  In the trial court, however,
appellant orally argued the array was impermissibly suggestive only because
appellant had a light skin tone, and only one other man in the array had a
similar skin tone.[3]  In his written
motion, appellant had also contended the other man with lighter skin tone had
very short hair, while appellant had longer hair.

Appellant
did not argue to the trial court that a difference in facial structure rendered
the array impermissibly suggestive.  He, therefore, has not preserved this
argument.  See Tex. R. App. P. 33.1(a)(1)(A); Wilson, 71 S.W.3d
at 349.








Turning
to the argument regarding hair length, we observe that appellant and one other
man in the photo array have medium length hair; three men, short hair; and one
man, a receding hair line.  There is no reason, however, to require the police
to use photographs of persons with like hair styles.  See Ward v. State,
474 S.W.2d 471, 476 n.5 (Tex. Crim. App. 1971) (AHair styles, like clothing styles,
change rather rapidly.  We see no reason for placing an impossible burden on
the police by requiring them to use only photographs of persons with like hair
styles.@).

Nevertheless,
even if we could conclude this aspect of the procedure was suggestive, we
cannot conclude it was impermissibly so.  See Barley, 906 S.W.2d at 33B34.  The difference in hair length
would not have been relevant to Cockerham=s identification of appellant because
the robber was wearing a cap.  Appellant has not shown by clear and convincing
evidence the array, if suggestive, was impermissibly so.  See id.

Finally,
assuming only for purposes of argument that the procedure was impermissibly
suggestive, we cannot, as discussed below, conclude the procedure gave rise to
a substantial likelihood of irreparable misidentification.  We turn now to the
second step of the analysis.

To
determine whether a suggestive procedure gave rise to a  substantial likelihood
of irreparable misidentification at trial, we ask whether the subsequent
in-court identification testimony is reliable under the totality of the circumstances. 
See Webb, 760 S.W.2d at 269.  In assessing reliability under the
totality of the circumstances, we weigh the following five non‑exclusive
factors against the corrupting effect of any suggestive identification
procedure:  (1) the opportunity of the witness to view the perpetrator at the
time of the crime; (2) the witness=s degree of attention; (3) the
accuracy of the witness=s prior description of the perpetrator; (4) the level of
certainty demonstrated by the witness at the confrontation; and (5) the length
of time between the crime and the confrontation.  Ibarra v. State, 11
S.W.3d 189, 195 (Tex. Crim. App. 1999) (citing Neil v. Biggers, 409 U.S.
188, 199 (1972)).  We consider these and other relevant factors deferentially
in the light most favorable to the trial court=s ruling.  See id.  Viewing
the factors in this light, we then weigh them de novo against the corrupting
effect of the suggestive pretrial identification procedure.  See id. at
195B96.








Cockerham
saw appellant twice the night of the crime.  The first time he was in Sonny=s Game Room long enough to get
directions and for Cockerham=s husband to draw him a map.  The second time, appellant was
two to two-and-a-half-feet from Cockerham, close enough to grab her by the
arm.  The surveillance videos show a total of at least one minute of contact
between Cockerham and appellant.  Cockerham had adequate opportunity to observe
appellant.

 At
times, Cockerham=s face was within inches of appellant=s face.  During both  encounters,
Cockerham interacted with appellant and maintained eye contact with him. 
Cockerham afforded appellant a high degree of attention.

Cockerham
described appellant as being a black male of medium height with muscular build,
dark brown eyes, and pretty lips.  She was admittedly mistaken about his build
because he was wearing a jacket the night of the robbery.  She testified that,
in selecting appellant=s photo from the array, she Awent by the lips and the eyes.@

Despite
writing she Abelieve[d]@ appellant was the man who robbed her, Cockerham repeatedly
testified she did not guess or have a doubt.  The only aspect that somewhat
confused her was the hair because appellant had been wearing a cap.  Cockerham
used the word Abelieve,@ in response to the officer=s question.  It was a figure of
speech.

The
robbery occurred on December 12, 2006; the photo identification, on February
22, 2007; and the in-court identification, on January 8, 2008.  This time span,
however, does not undermine the reliability of Cockersham=s in-court identification.  See
Delk, 855 S.W.2d at 705B08 (concluding eighteen‑month time span between robbery
and in‑court identification did not undermine reliability because witness
remembered details and provided consistent testimony).








After
reviewing the totality of the circumstances, we conclude appellant has not
shown by clear and convincing evidence that the photo array identification was
impermissibly suggestive and that it resulted in a very substantial likelihood
of irreparable misidentification at trial.  See Barley, 906 S.W.2d at 33B34; Delk, 855 S.W.2d at 706. 
Accordingly, we overrule appellant=s third issue.

C.        Punishment Phase

Issue
five: admission of the motion to revoke community supervision attached to the
judgment of conviction for an enhancement offense to which appellant pleaded
true.  In issue
five, appellant argues the trial court erred in admitting, over appellant=s objection, a motion to revoke
community supervision.  The motion at issue resulted in, was attached to, and
was incorporated by reference in, a Galveston County judgment to which
appellant pleaded true.  Appellant had no objection to the Galveston County
judgment itself.  The motion to revoke referred to a 1995 conviction in San
Bernadino County, California, as the sole ground for revocation.[4]

Appellant=s objection to the motion to revoke
consisted entirely of the following:

In looking at this a second time, Judge, looking at the entire
document, this is two separate documents.  Now the judgment in [sic] the motion
itself is two different things.  We=re
going to object to the Motion to Revoke Probation, Community Supervision.  We
have no objection to the judgment itself.  But the motion, we object to that.

 

The trial court overruled
the objection, and published the Galveston County judgment and the attached
motion to the jury.








Appellant
provided the trial court with no ground for his objection.  See Tex. R.
App. P. 33.1(a) (providing that,
as prerequisite to presenting complaint for appellate review, record must show
complaint was made to trial court by timely request, objection, or motion
stating grounds for the ruling sought from trial court with sufficient
specificity to make trial court aware of complaint, unless specific grounds
were apparent from context).  On appeal, he  sets forth arguments he
successfully asserted in the trial court in relation to State=s exhibit  twenty-five, a certified
copy of a California federal court judgment, unrelated to the conviction to
which the Galveston County motion refers.  Appellant did not explain to the
trial court, and does not explain to this court, how those arguments are
germane to the revocation motion about which he now complains.

Appellant
has thus presented nothing for review.  See Tex. R. App. P. 38.1(h) (providing appellant=s brief must contain clear and
concise argument for contentions made, with appropriate citations to
authorities and to record).  Accordingly, we overrule appellant=s fifth issue.

III.  Conclusion

Having
overruled appellant=s five issues, we affirm the judgment.

 

 

 

 

/s/        Charles Seymore

Justice

 

 

 

Panel consists of Justices Yates,
Seymore, and Boyce.

Do Not Publish C Tex. R. App. P. 47.2(b).









[1]  Appellant also filed pretrial motions to suppress
Cockerham=s out-of-court and in-court identifications of
appellant.  As set forth below, the trial court heard and denied those motions
during trial.





[2]  The State also informed the court it intended to
introduce a certified copy of a federal judgment from California.  Appellant
objected, and the trial court sustained the objection.





[3]  Appellant does not renew the skin-tone argument in
this court.





[4]  Appellant successfully opposed admission of a
certified judgment of conviction from a California federal court.