02-11-029-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00029-CR

 

 


 
 
 Gary Wayne Bryant
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

FROM THE 371st
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I.  Introduction

          A
jury convicted Appellant Gary Wayne Bryant of aggravated robbery with a deadly
weapon and sentenced him to fifty-five years’ confinement.  In two points,
Bryant argues that the trial court erred by admitting evidence of an extraneous
offense and by refusing to exclude identification testimony.  We will affirm.

II.  Background

          On
Saturday morning, February 27, 2010, Elida Salas was at her home with her ten-
and twelve-year-old daughters and her three-year-old nephew when someone
knocked on the front door.  Salas eventually answered the door, and a nicely
dressed lady asked for Maria Gonzalez.  When Salas told the lady that Maria
Gonzalez lived across the street, an individual who Salas identified at trial
as Bryant appeared from behind the lady with a gun, forced his way into Salas’s
house, grabbed her by the neck, and hit her head with the gun.  Bryant, who was
wearing a black bandana and a white cap, asked where Salas’s husband and where
“the money” was, and he locked two of the children in the bathroom and hit one
of them on the head.[2]  Bryant returned to Salas;
asked about the combination to a safe in the house, which Salas did not know; hit
her with the gun several more times; and searched the rest of the house while
the lady who initially knocked on the front door watched over Salas.  Bryant
collected several items from around the house; took the keys to Salas’s SUV;
pulled the SUV up to the front door; and loaded the items, including a flat-screen
television, into the SUV.  When Bryant and the lady drove away, the television
fell out of the back of the SUV and onto the street, and Bryant ran over the
television several times with the SUV, leaving it in the street.  Police later
discovered the SUV at an apartment complex located about four or five blocks
from Salas’s residence.

          Later
in the day, Salas returned to her home after visiting the police station and
the hospital and discovered a white cap in one of the children’s bedrooms.  A police
officer collected the cap, and a major DNA profile that was discovered after
testing genetic material found inside of the cap was later compared to the DNA
profile from a buccal swab obtained from Bryant.  The profile from the buccal
swab matched the major profile from the cap, and a supervisor for the laboratory
that conducted the DNA testing opined that the probability of finding a random
individual with the same DNA profile as Bryant is one in 1.86 quadrillion.

          Detective
Ernie Pate interviewed Salas about six months after the robbery and showed her
a photographic spread that included Bryant’s photo.  Salas identified Bryant as
the person who had robbed her and was 100% sure of her choice.

          At
trial, Laura Montemeyor, an assistant manager at a pawn store, testified that
Bryant pawned a gold men’s ring on March 2, 2010.  Salas identified the ring as
belonging to her husband and said that Bryant took it during the robbery.

          Authorities
who investigated the robbery were also able to lift several prints from a few
items at Salas’s house, including the frame of the flat-screen television
discarded in the street.  Deborah Smith of the Fort Worth Police Department
Crime Laboratory testified that a palm print lifted from the television matched
Bryant’s left palm.

          During
the punishment phase, Sarah Kind testified that in November 2009, she was
working alone at a Subway restaurant in Rhome when a man entered the store,
pulled out a gun, climbed over the counter, and demanded money from the
register, a safe, and a cash box.  Kind recalled that the man ripped a phone
cord from the wall and tied her up with it before leaving.  Kind did not
identify Bryant as the assailant, but Amber Moss, a forensic scientist,
testified that she obtained a partial DNA profile from the telephone cord, that
Bryant’s DNA profile matched nine of fifteen “locations” on the partial profile
from the telephone cord, and that Bryant could not be excluded as a contributor
to the DNA profile from the telephone cord.

III.  Irrelevant Extraneous-Offense Punishment Evidence

          In
his first point, Bryant argues that the trial court abused its discretion by
admitting evidence at the punishment phase of trial related to the November
2009 Subway armed robbery.  Bryant contends that the trial court should not
have admitted a video taken from the store security system, still photographs
of the video footage, and photographs of the crime scene because the State
failed to prove that he was the person responsible for committing the armed
robbery.

          Relevant
evidence means “evidence having any tendency to make the existence of any fact
that is of consequence to the determination of the action more probable or less
probable than it would be without the evidence.”  Tex. R. Evid. 401.  During
the punishment phase of trial, the State may offer evidence as to any matter
the court deems relevant to sentencing, including evidence of an extraneous
crime or bad act that is shown beyond a reasonable doubt to have been committed
by the defendant or for which he could be held criminally responsible.  Tex.
Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (West Supp. 2011).  When
presented with an appropriate objection, the trial court has the initial
responsibility to determine the threshold issue of whether an extraneous
offense is admissible.  See Mitchell v. State, 931 S.W.2d 950, 953 (Tex.
Crim. App. 1996).  This threshold determination is not a finding by the trial
court that the State has proved an extraneous offense beyond a reasonable
doubt, but is instead a finding that sufficient evidence exists from which a jury
could reasonably so find.  See Smith v. State, 227 S.W.3d 753, 759–60
(Tex. Crim. App. 2007) (“Unless the extraneous misconduct evidence is such that
the [jury] can rationally find the defendant criminally responsible for the
extraneous misconduct, the trial court is not permitted to admit it at a
punishment hearing.”); Arzaga v. State, 86 S.W.3d 767, 781 (Tex. App.—El
Paso 2002, no pet.).  Then, the jury, as the exclusive factfinder, must
determine whether or not the State has proved the extraneous offense beyond a
reasonable doubt, and they should be so instructed when requested.[3] 
Mitchell, 931 S.W.2d at 954.

          We
review a trial court’s decision to admit evidence, including evidence of an
extraneous offense during the punishment phase, under an abuse of discretion
standard.  Id. at 953.

          The
first item of extraneous-offense evidence that Bryant objected to was the surveillance
video taken from the store security system.  When the State offered the video
in evidence, Kind had not identified Bryant as the person responsible for
committing the armed robbery, nor had any other evidence been admitted linking
Bryant to the offense.  The following exchange occurred at the bench:

          [Defense
counsel]:   My ultimate objective is not to object, but I think that
technically I would have an objection at this point if they don’t show that
what we’re about to see is relevant to the Defendant.  So I think they need to
have her identify the Defendant as the person the tape is about.  Then it
becomes relevant, but I think at this point they haven’t shown relevance, so I
would have to object.

          [State]:  . . . 
Right now, we’re proving what happened in the offense.  It’s our plan to
connect him to it with other evidence and witnesses later.

          [Defense
counsel]:   Well, at this point, I’m going to object that they haven’t shown
the relevance because they haven’t shown that my client is the person who
committed the robbery. . . .

          THE COURT:   I’m
going to overrule that objection.  If it becomes an issue later on -- if
at the end of this line of witnesses, you still feel you have that same
objection, we’ll take it up at that point.

          [Defense
counsel]:   Okay.  So you’re basically letting it in on the assumption
they’re going to connect it up later?

          THE COURT:   Yes. 
[Emphasis added.]

          As
the State indicated at the bench conference, after Kind’s testimony concluded,
James Holland testified that he is a Texas Ranger, that he investigated the
November 2009 Subway armed robbery, that Bryant became a suspect at some point
during the investigation, and that he obtained a search warrant for and collected
a buccal swab from Bryant.

          After
Holland testified, Moss testified that she was able to obtain a partial DNA
profile from the telephone cord used by the assailant to restrain Kind during
the Subway armed robbery and that Bryant’s DNA profile obtained from the buccal
swab matched nine of fifteen “locations” on the partial profile from the
telephone cord.  Moss opined that Bryant could not be excluded as a contributor
to the DNA profile from the telephone cord and that there was a one in 2.7
million likelihood of finding another random individual with similar DNA as the
nine locations from the profile on the telephone cord.

          At
the conclusion of Moss’s testimony, Bryant moved to strike all of the testimony
regarding the Subway armed robbery on the same grounds that he had previously
urged, and the trial court denied his motion.

          The
record thus demonstrates that although the State had not elicited testimony
connecting Bryant to the Subway armed robbery when it offered the surveillance
video and photographs in evidence during Kind’s testimony, it subsequently
offered evidence through Holland’s and Moss’s testimony from which the jury
rationally could have determined that Bryant committed the Subway armed
robbery.  See Mitchell, 931 S.W.2d at 953; see also Smith, 227
S.W.3d at 759–60.  The court of criminal appeals has reasoned that evidence
should not be excluded merely because its relevance may depend upon the
production of additional evidence at a later point in trial.  See Fuller v.
State, 829 S.W.2d 191, 198 (Tex. Crim. App. 1992), cert. denied, 508
U.S. 941 (1993), overruled on other grounds by Castillo v. State, 913
S.W.2d 529, 534 (Tex. Crim. App. 1995); see also Tex. R. Evid. 104(b). 
We see no reason why this standard should not have applied when the trial court
made its admissibility determination of the extraneous-offense evidence at
punishment, especially considering that the trial court had the opportunity to
reconsider the same extraneous-offense evidence when Bryant reasserted his
objection after Holland’s and Moss’s testimony.

          Accordingly,
to the extent that Bryant argues that the complained-of extraneous-offense evidence
was irrelevant, we hold that the trial court did not abuse its discretion by
admitting the evidence.  To the extent that Bryant challenges the
extraneous-offense evidence under article 37.07, we hold that in determining
the threshold issue of admissibility of relevant evidence, the trial court did
not abuse its discretion by admitting the extraneous-offense evidence on the
condition that the State connect Bryant to the armed robbery through evidence
elicited from witnesses other than Kind, which the State successfully did, and
by determining that the extraneous-offense evidence was admissible.  See
Mitchell, 931 S.W.2d at 953.

          Bryant
also argues that even if the extraneous-offense evidence was relevant to his
punishment and admissible, the trial court still abused its discretion by
admitting the evidence because its probative value was substantially outweighed
by the danger of unfair prejudice, confusion of the issues, or one of the other
countervailing considerations listed in rule of evidence 403.  To preserve a
complaint for our review, a party must have presented to the trial court a timely
request, objection, or motion that states the specific grounds for the desired
ruling if they are not apparent from the context of the request, objection, or
motion.  Tex. R. App. P. 33.1(a)(1); Lovill v. State, 319 S.W.3d 687,
691–92 (Tex. Crim. App. 2009).  Bryant did not assert an objection to the
extraneous-offense evidence under rule 403, nor was such an objection apparent
from the context of his relevance objection.  Accordingly, Bryant failed to
preserve this part of his first point for appellate review.  See Tex. R.
App. P. 33.1(a)(1); Lovill, 319 S.W.3d at 691–92; McClure v. State,
269 S.W.3d 114, 119 (Tex. App.—Texarkana 2008, no pet.) (addressing appellant’s
rule 403 argument in relation to extraneous-offense evidence after observing
that appellant “preserved this issue by first raising this objection during
trial”).

          We
overrule Bryant’s first point.

IV.  In-Court Identification

          In
his second point, Bryant argues that the trial court erred by admitting Salas’s
in-court identification of Bryant because her testimony was tainted by an impermissibly
suggestive pretrial identification procedure.

          Whether
a pretrial identification procedure was impermissibly suggestive is a mixed
question of law and fact that does not turn on an evaluation of credibility and
demeanor.  See Loserth v. State, 963 S.W.2d 770, 773 (Tex. Crim. App.
1998).  Therefore, we apply a de novo standard of review.  Id.

          An
in-court identification is inadmissible when it has been tainted by an
impermissibly suggestive pretrial identification procedure.  Id. at
771–72.  We use a two-step analysis in determining whether the trial court
correctly admitted an in-court identification:  (1) whether the
out-of-court identification procedure was impermissibly suggestive, and if so,
(2) whether the impermissibly suggestive procedure gave rise to the
substantial likelihood of irreparable misidentification.  Barley v. State,
906 S.W.2d 27, 33 (Tex. Crim. App. 1995), cert. denied, 516 U.S. 1176
(1996).

          Suggestiveness
may arise from the manner in which a pretrial identification procedure is
conducted.  Id. at 33–34.  For example, a police officer may point out
the suspect or suggest that a suspect is included in a lineup or photographic
array.  Id.  Also, the content of a lineup or photographic array itself
may be suggestive if the suspect is the only individual who closely resembles
the description given by the witness.  Id.  But a photographic array is
not impermissibly suggestive merely because each photograph can be
distinguished in some manner from the photograph of the accused.  Page v.
State, 125 S.W.3d 640, 647 (Tex. App.—Houston [1st Dist.] 2003, pet.
ref’d).  A defendant bears the burden of establishing by clear and convincing
evidence that the pretrial identification procedure was impermissibly
suggestive.  Barley, 906 S.W.2d at 33–34; Cienfuegos v. State,
113 S.W.3d 481, 491 (Tex. App.—Houston [1st Dist.] 2003, pet. ref’d).

          Bryant
argues that the pretrial identification procedure used by Detective Pate was
impermissibly suggestive because he told Salas that DNA was recovered from the
white cap left at her home after the robbery and that the photograph of a
suspect was included in the photographic spread.  Salas testified at the
hearing on Bryant’s motion to suppress that she met with Detective Pate
approximately six months after the robbery occurred and that he showed her six photographs
and asked her if she could identify the person who committed the robbery.  Salas
recalled that Detective Pate did not tell her who to pick, did not give her any
hints or clues, and told her to tell the truth.  Salas looked at each of the
photographs and, based on her recollection, put her initials on the photograph
of the person who she recalled committed the robbery.  At the time, Salas told
Detective Pate, “I’m sure.”  Salas identified Bryant in court as the person who
committed the robbery.

          On
cross-examination, Salas testified that Detective Pate did not tell her that
the suspect was one of the six individuals in the photographs that she was
about to view.  The following thorough exchange took place between Salas,
defense counsel, and the trial court regarding whether Detective Pate informed
Salas that the suspect was included in the photographic spread:

          [Defense
counsel]:   Did the officer tell you that the suspect was one of the six people
in the pictures that you were going to be looking at?

 

          [Salas]:   No,
he didn’t tell me, so I pick.  You know, he just showed me the pictures and I
pick.

 

          [Defense
counsel]:   All right.  So your answer is:  No, he did not tell me
that?

 

          [Salas]:   I
don’t want you to twist like the question because, like I say, I don’t
understand very well English, so I don’t want you twist the question and make
me wrong, make me say wrong.  So he gave me those pictures, and I pick, you
know --

 

          [Defense
counsel]:   I haven’t asked you about that yet.  I’m just asking you to focus
on the questions I’m asking.

 

          THE COURT:   Let
her finish her statement.

 

                             . . . .

          [Salas]:   Yes. 
Well, he showed me the pictures, and he brung me, you know, several pictures,
and I pick -- I separate by groups, and I pick the right picture
because I knew that -- those pictures was him, and I pointed, and I
told him, “This is the picture.  This is the man,” and I sign it, and I give it
to him.

 

          THE COURT:   What
instructions did he give you before he showed you the pictures?  What did he
tell you?

 

          [Salas]:   What -- take your time and relax, and so if he is not --if he is not a man in those
pictures, you don’t find it.  So just take your time and, you know, do whatever
you have to do it.  So -- and I picked the -- I pulled, you
know, in three groups the pictures, and I separate, and I separate his picture
the last, and I put in the one side, and then after I through the other ones,
and I keep his picture, and I told him, “This is it.  This is him.”

 

          THE COURT:   Did
the detective ever tell you that the person who did the robbery was in the
pictures?

 

          [Salas]:   He
didn’t told me.  He didn’t told me that the robbery was in those pictures.  He
just told me, “Just look at them,” and so --

 

          THE COURT:   Did
he ever tell you that the suspect was in the pictures?

 

          [Salas]:   He -- he
just -- he just told me maybe he’s in the pictures, maybe not, so….

 

          THE COURT:   Did
he ever tell you the person whose DNA matched the crime scene or matched the --

 

          [Salas]:   No,
he didn’t tell me.  No.

 

          At
trial,[4] Salas testified that
Detective Pate did not tell her that she had to pick someone, that Detective
Pate did not influence her when she was viewing the photographs, that she felt
no pressure to identify someone, and that she chose Bryant’s photograph based
on what she remembered from the robbery.  On cross-examination, Salas acknowledged
that Detective Pate told her that the police had identified a suspect, but she
seemed to give conflicting testimony about whether Detective Pate told her that
a suspect’s photograph was included in the photographic spread:

          [Defense
counsel]:   And did he tell you that he had a suspect in the case?

 

          [Salas]:   Yes. 
He told -- he told me that he has -- yes, he told me that.

 

          [Defense
counsel]:   Okay.  And he told you that DNA in the hat that -- that
the white beanie recovered from your house had been connected to the suspect;
is that correct?

 

          [Salas]:   Yes.

 

          [Defense
counsel]:   All right.  And he said that the suspect was one of the pictures
he’s going to show you, but he didn’t tell you which one?

 

          [Salas]:   No,
he didn’t tell me which one.

 

          [Defense
counsel]:   Okay.  And so when he showed you the pictures, though, you knew the
suspect was one of them; you just didn’t know which one it was going to be
until you saw them?

 

          [Salas]:   Yes.

 

          Among
other things, Detective Pate testified that he read instructions to Salas
before showing her the photographic spread, and one portion of those
instructions stated that “[t]he fact that the photos are being shown to you
should not cause you to believe or guess that the guilty person has been
caught.”  He acknowledged that Salas knew that DNA had been recovered, but he
did not answer affirmatively defense counsel’s question whether he told Salas
that the suspect’s photograph was included in the photographic spread:

          [Defense
counsel]:   All right.  And you told her that the male that you suspected was
one of the six people that she was going to be looking at; is that correct?

          [Detective
Pate]:   I read her the instructions that were on the card that we -- have
been marked.

          The
only evidence that arguably supports Bryant’s contention that Salas knew that a
suspect was included in the photographic spread is Salas’s conflicting
testimony on cross-examination.  The other relevant evidence overwhelmingly
demonstrates that Detective Pate did not inform Salas that a suspect was
included in the photographic spread before Salas viewed it.  Consequently, we
cannot conclude that Bryant met his burden to establish by clear and convincing
evidence that the pretrial identification procedure used by Detective Pate was
impermissibly suggestive.  See Barley, 906 S.W.2d at 33–34.

          We
also conclude that even if the identification procedure was impermissibly
suggestive, it did not give rise to a substantial likelihood of irreparable
misidentification.  Reliability is the critical question, and “if the totality
of the circumstances reveals no substantial likelihood of misidentification
despite a suggestive pretrial procedure, subsequent identification testimony
will be deemed ‘reliable.’”  Ibarra v. State, 11 S.W.3d 189, 195 (Tex.
Crim. App. 1999), cert. denied, 531 U.S. 828 (2000); Webb v. State,
760 S.W.2d 263, 269 (Tex. Crim. App. 1988), cert. denied, 491 U.S. 910
(1989).  In assessing reliability, we consider the following factors:  (1) the
opportunity of the witness to view the criminal at the time of the crime, (2) the
witness’s degree of attention, (3) the accuracy of the witness’s prior
description of the criminal, (4) the level of certainty demonstrated by
the witness at the confrontation, and (5) the length of time between the
crime and confrontation.  Loserth, 963 S.W.2d at 772; see Neil v.
Biggers, 409 U.S. 188, 199–200, 93 S. Ct. 375, 382 (1972). 
These five factors are reviewed deferentially in a light most favorable to
the trial court’s ruling and then weighed de novo against the corrupting
effect of the suggestive pretrial identification procedure.  Loserth,
963 S.W.2d at 773–74.

          Salas
testified that she observed Bryant’s face for about seven of the approximately
thirty minutes that the robbery lasted and that she recalled certain features
of his face and body.  Salas also testified that instead of lying on the ground
and pretending like she had fallen over, she watched Bryant and looked at his
face while he loaded items into the SUV.  The description that Salas gave to
the police (black male, age twenty to twenty-six, about five feet seven inches
tall, 170–180 pounds) was relatively accurate.  Both Salas and Detective Pate
recalled that Salas was 100% sure of her identification when she viewed the
photographic spread.  And the length of time between the crime and the
identification was approximately six months.  The totality of the circumstances
reveals no substantial likelihood of misidentification; Salas’s in-court
identification of Bryant was reliable.  See Ibarra, 11 S.W.3d at 195; Loserth,
963 S.W.2d at 772.

          We
hold that the trial court did not err by denying Bryant’s motion to suppress
Salas’s identification testimony, and we overrule Bryant’s second point.

V.  Conclusion

          Having
overruled both of Bryant’s points, we affirm the trial court’s judgment.

 

 

BILL MEIER
JUSTICE

 

PANEL:  DAUPHINOT, MEIER, and GABRIEL, JJ.

 

DO NOT PUBLISH

Tex. R. App.
P. 47.2(b)

 

DELIVERED: 
January 19, 2012









[1]See Tex. R. App. P. 47.4.





[2]Salas’s husband was
working at the family’s restaurant that morning.





[3]The trial court instructed
the jury that it could consider the extraneous-offense or bad-acts evidence in
assessing Bryant’s punishment only if the State proved beyond a reasonable
doubt that Bryant committed the offense or that the offense was one for which
he could be held criminally responsible.





[4]In determining whether a
trial court’s decision is supported by the record, we generally consider only
evidence adduced at the suppression hearing because the ruling was based on it
rather than evidence introduced later.  See Gutierrez v. State, 221
S.W.3d 680, 687 (Tex. Crim. App. 2007); Rachal v. State, 917 S.W.2d 799,
809 (Tex. Crim. App.), cert. denied, 519 U.S. 1043 (1996).  But this
general rule is inapplicable when the parties consensually relitigated the
suppression issue during trial on the merits.  Gutierrez, 221 S.W.3d at
687; Rachal, 917 S.W.2d at 809.  If, as in this case, the State raised
the issue at trial either without objection or with subsequent participation in
the inquiry by the defense, the defendant is deemed to have elected to reopen
the evidence, and we may consider the relevant trial testimony in our review.  Rachal,
917 S.W.2d at 809.