

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-11-00217-CR
_____

LEMURIA TAFAWN MCKNIGHT, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 6th Judicial District Court
Lamar County, Texas
Trial Court No. 22610

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

Lemuria Tafawn McKnight was convicted of robbery in a trial to the bench. The trial court found him guilty and sentenced him to ten years' incarceration. McKnight's appeal claims the evidence was insufficient to support the verdict, and the procedure by which police showed the victim photographs of possible suspects was impermissibly suggestive. We affirm.

## Sufficiency of the Evidence

We begin with McKnight's second point of error, claiming the evidence was insufficient[1] to support his conviction. Three and one-half years elapsed between the robbery and the trial. Leslie Davis testified at trial, in September 2011, that it was raining late morning or midday March 3, 2008, when she stopped at a convenience store in Paris, Texas. Davis testified that she got out of her car, turned to lock it, and a black man, "a little over" six feet in height, of medium build, hit her in the face, "[s]everal" times. The robber called her a "bitch" and told her to give him her keys. He grabbed the keys, but when Davis held on to them, he hit her again and grabbed her neck or her necklace (which was found on the ground a short distance away) and asked Davis, "[W]hat else you got." In the fracas, Davis's shirt and jacket pocket were torn— she said the pocket was torn when the robber tried to reach into it. The robber ran away, and

---

[1] In evaluating the legal sufficiency of the charged offense, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the crime beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Legal sufficiency is measured by the elements of the offense as defined by a hypothetically-correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

Davis called 9-1-1 and then her fiancé. Davis said the robber was "clean shaved," and had a tattoo on his neck, which she described as "cursive [writing], with a name." The tattooed name was a "whole word, in black." The assailant wore "dark clothing. I remember, like, a green shirt, long sleeve, blue jeans and some kind of boots." At trial, Davis identified McKnight as the robber.[2]

Paris police officer Doug Murphy responded to the scene. He said Davis was crying and visibly upset; she had a torn shirt; she held a broken necklace; her coat pocket was ripped; and her face was red, "puffy, the beginning of swelling." Davis described her attacker to Murphy as a black male between six foot, one inch to six foot, three inches tall; of "thin build."[3] Davis told Murphy the robber "had very dark evil-looking eyes and had a tattoo on his neck that was in cursive writing." She described the attacker as wearing a green jacket, jeans, and black tennis shoes.

Jeff Springer was the Sergeant Detective assigned to the case; he met with Davis the day of the attack at the police station. He described Davis as "very upset," with redness in the face, "like bruising, like she'd been in a struggle," with a torn shirt. Springer said Davis described her assailant as a black male of slender build with short hair; she said he had "a tattoo on the left side of his neck, cursor-type writing" with letters about an inch tall. As for the robber's clothing,

___

[2]Davis also testified a woman identifying herself as McKnight's mother called her a few days after the robbery, saying that if Davis did not "drop it, they don't know what's going to happen." The caller said she knew Davis's vehicle and where she lived; Davis said she was frightened by the call. McKnight's mother acknowledged calling Davis, but denied threatening her.

[3]Initially, under cross-examination from McKnight's attorney, Murphy said that Davis described the robber as between "190 to 210," presumably pounds. When Murphy reviewed his written report, though, he acknowledged Davis had not given a weight. A constant theme throughout trial was the length of time between the offense and trial.

Springer said Davis described him as wearing a green jacket, blue jeans, and some dark colored shoes.[4]  Springer showed Davis two photographic line-ups, which had six pictures each:  Davis did not identify any of those persons as her robber.  Three days later, Springer showed Davis sixteen photographs he had collected of black males who had previously been arrested in Lamar County.[5]  Davis identified one of these, a photograph of McKnight, as her attacker.  Specifically, Davis told Springer she was "99.99 percent" sure of her identification.  Springer then showed Davis a driver's license photograph of McKnight, and she said, "[Y]es, that's definitely him."  The set of sixteen photographs, from which Davis selected McKnight, are included in the appellate record.  On McKnight's neck is a mark that appears to be a tattoo; the one photographic subject bearing no facial hair also has marks on his neck, which look very much like a tattoo.

In his defense, McKnight presented testimony from four family members.  His parents both testified McKnight had been home the entire day of March 3, 2008, specifically during lunch time.  Both said he could not have left the house and been away during the time of the robbery.  Two of McKnight's sisters also testified that although they were at work or school on the date in question, they saw McKnight at the family home in the morning and after 5:00 p.m. when they returned from work or school.  Several of the family members testified they had never seen McKnight in a green shirt; that he seldom if ever wore jeans; nor had they ever seen him

---

[4]In cross-examination McKnight made much of the fact police never sought a search warrant to look for clothing in McKnight's possession that matched Davis's description given in trial and to the officers.  Springer said he felt the description was too generic to justify a search warrant.  Had the description included "some kind of identifying mark on the jacket or a logo," a search warrant might have been sought.  The only witness who said Davis described the shirt as having lettering was Danny Huff, who made the composite drawing.  This description was also in Huff's report, entered into evidence as defense exhibit 3.  Davis's trial testimony, and her descriptions at the time of the offense, as related by Springer and Murphy, did not include reference to lettering on the robber's shirt front.

[5]The photographic lineups are addressed in our discussion of McKnight's first point of error.

4

wear black thick-soled boots. His sisters testified McKnight only owned one pair of shoes, which were white Reebok tennis shoes. McKnight's father testified that McKnight did not have a driver's license—testimony inconsistent with Detective Springer's testimony that he had shown Davis McKnight's driver's license photograph.

In rebuttal, the State played recordings of two telephone calls made from the police station to the McKnight family home. The first was McKnight calling home after his arrest. His mother answered, and he told her he was being held for a robbery charge. When speaking with Springer, Mrs. McKnight assured him that McKnight had been home all day Monday, the third. She stated twice that a plumber was at the home that day. The second call is Detective Springer calling McKnight's father; the senior McKnight assured Springer he, his wife, and daughters were all home and could attest that McKnight was home that day; but the father said no visitors were present. When Springer advised Mr. McKnight that Mrs. McKnight indicated a plumber was at the home the day in question, Mr. McKnight stated the plumber was there on Tuesday. At this point, Mr. McKnight was silent for several seconds, and then stated, "Well . . ." and abruptly told Springer he would have to get back with him. Based on the labeling of the exhibit, this telephone call seems to have occurred March 10. Mr. McKnight indicated he would come to the police station the next day to complete a statement. However, the written statements provided by the family members were not provided until April 3 (from the two parents) and April 8 (from McKnight's sisters).

The trier of fact resolves conflicts in testimony and determines the credibility of witnesses. *See Hooper*, 214 S.W.3d at 13 (citing *Jackson*, 443 U.S. at 318–19). Here, the trial

court was free to disbelieve or discount McKnight's alibi witnesses and believe Davis's identification. The evidence is sufficient to prove McKnight, in the course of committing theft of property,[6] with intent to maintain control of that property, intentionally, knowingly, or recklessly caused bodily injury to Davis. The evidence is sufficient to support the conviction. We overrule McKnight's second point of error.

**Photographs Shown to Victim**

McKnight complains that when Detective Springer showed a stack of sixteen photographs of possible suspects to Davis, the submitted photographs were "overly suggestive," which tainted Davis's trial identification of McKnight as the man who robbed her. When faced with a challenge to an out-of-court identification, a trial court must look to the totality of the circumstances surrounding the identification to determine if a procedure was so unnecessarily suggestive and conducive to irreparable mistaken identification that the defendant was denied due process of law. *Webb v. State*, 760 S.W.2d 263, 272 (Tex. Crim. App. 1988). In the first step in this analysis, the trial court determines whether the identification procedure was impermissibly suggestive. *Barley v. State*, 906 S.W.2d 27, 33–34 (Tex. Crim. App. 1995). If the trial court determines the identification is impermissibly suggestive, the court must then consider the factors enumerated in *Neil v. Biggers*[7] to determine whether the suggestive procedure gave

---

[6]"'In the course of committing theft' means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." TEX. PENAL CODE ANN. § 29.01(1) (West 2011).

[7]409 U.S. 188 (1972). The *Biggers* factors are: (1) the witness's opportunity to view the criminal act, (2) the witness's degree of attention, (3) the accuracy of the suspect's description, (4) the level of certainty at the time of confrontation, and (5) the time between the crime and confrontation. *Barley*, 906 S.W.2d at 34–35.

6

rise to a substantial likelihood of irreparable misidentification. Throughout this process, the burden is on the movant to show impermissible suggestion and substantial likelihood of misidentification by clear and convincing evidence. *See Barley*, 906 S.W.2d at 33–34.

As mentioned above, the day of the robbery, Davis was shown two photographic line-ups, each having six photographs: Davis did not identify any of those persons as her attacker. About three days later, she returned to the police station. Springer had obtained about twenty-five photographs of possible suspects, meeting the description of a black male, six feet tall, with a tattoo on the left side of the neck. Springer culled this selection down to sixteen, eliminating those where the tattoo lettering was "too big" to correspond with Davis's description, and those persons who were incarcerated at the time. Springer took Davis to Huff, a police officer who made a composite image of a suspect based on Davis's description. Springer then gave the stack of sixteen photographs[8] to Davis and told her, "[I]f you see the person . . . point them out to me." Springer said he handed the photographs to Davis in a stack, and she looked at them one at a time. At the time, Springer did not know any of the persons in the photographs by name; he had contact with McKnight in years past, but at the time of the Davis investigation, McKnight was not a person of interest in the case. Davis looked through the stack; when she came to McKnight's photograph, her "hand started trembling, [her] voice started shaking, and she said, this is him." Springer asked Davis how sure she was of her identification; she said, "99.99 percent." Springer then showed Davis McKnight's driver's license photograph, and Davis said, "[Y]es, that's definitely him."

---

[8]These photographs were obtained from book-in photographs at the sheriff's office; they were too large to fit in the usual six-picture format used for photographic line-ups.

We have reviewed the sixteen photographs shown Davis. All of the photographs show African-American men, perhaps in their twenties or thirties. While the photographs of McKnight and one other man are the only ones without facial hair, several of the photographs show men with very thin moustaches and/or beards. Some of the photographs depict men with tattoos on their necks. In some of the photographs, however, it cannot easily be determined if there is a tattoo on the subject's neck; if a shadow or trick of light suggests a tattoo; or if there is no tattoo or mark on the neck at all.

We do not find the photographs shown to Davis were impermissibly suggestive. The differences in facial hair among the subjects does not render the line-up impermissibly suggestive. In *Withers v. State*, 902 S.W.2d 122, 125 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd), the defendant was clean shaven at the time of his identification, but two of the four others in the nonphotographic line-up had beards. This dissimilarity did not render the line-up unduly suggestive.[9] Further, simple minor discrepancies between lineup participants will not render a lineup unduly suggestive. *Partin v. State*, 635 S.W.2d 923, 926 (Tex. App.—Fort Worth 1982, pet. ref'd). As for the tattoos on the pictured subjects, the trial court had great difficulty even seeing the neck tattoo in McKnight's photograph. Reviewing, in the totality of the circumstances, the sixteen photographs presented Davis, we do not find the procedure used by Springer to be unduly suggestive.

---

[9]There were several other dissimilarities present in *Withers*: the other subjects ranged in age from twenty-one to forty-one, had heights of 5'9" to 6'1", and weighed between 155 to 205 pounds. Withers was thirty-nine, 5'8", and weighed 160 pounds. *See also Turner v. State*, 600 S.W.2d 927, 932 (Tex. Crim. App. [Panel Op.] 1980) (line-up of five persons, two of whom had beards and not physically close to defendant in size and hair color, not impermissibly suggestive).

8

The line-up procedure not being unduly suggestive, it is not necessary for us to consider the reliability of Davis's in-court identification. *See Barley*, 906 S.W.2d at 34 (where photographic line-up procedure not impermissibly suggestive, court need not examine record to determine if substantial likelihood of misidentification present). McKnight's first point of error is overruled.

We affirm the trial court's judgment and sentence.

Bailey C. Moseley
Justice

Date Submitted:     June 25, 2012
Date Decided:       July 11, 2012

Do Not Publish

9